[No. D052124. Fourth Dist., Div. One. Jan. 6, 2009.]

ADAM RANKIN, Plaintiff and Appellant, v.
LONGS DRUG STORES CALIFORNIA, INC., Defendant and Respondent.

COUNSEL

Law Office of Terry J. Chapko, Terry J. Chapko; Goldstein, Demchak, Baller, Borgen & Dardarian, David Borgen, Laura L. Ho, Heather Mills; Bohm, Matsen, Kegel & Aguilera and A. Eric Aguilera for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Timothy J. Long, Michael D. Weil and Mary K. DuBose for Defendant and Respondent.

OPINION

**McDONALD, J.**—Plaintiff Adam Rankin filed this lawsuit alleging that defendant Longs Drug Stores California, Inc. (Longs), violated California law because Longs's employment application contained a question (the question) asking whether Rankin had been convicted of a crime involving the use or possession of illegal drugs during the preceding seven years.[1] Rankin sought, on behalf of himself and all others similarly situated during the relevant class period, the statutory recovery specified under Labor Code section 432.7, subdivision (c). The court certified the class, rejected Longs's pretrial motions arguing that section 432.7 was preempted by federal law, and proceeded to trial.

At trial, the court rejected Longs's arguments that the federal laws in effect during the class period preempted section 432.7, and rejected Longs's claim that federal legislation enacted after the class period (the Combat Methamphetamine Epidemic Act of 2005 (CMA))[2] was a clarification of, rather than a change in, existing laws for purposes of the federal preemption issue. However, the trial court invited the parties to address whether enactment of the CMA should operate to abate any action against Longs alleging violation of section 432.7. After further briefing, the court found the enactment of the CMA operated to abate an action seeking an award under section 432.7, and dismissed Rankin's action. This appeal followed.

---

[1] Rankin alleged the question violated Labor Code section 432.7, as amplified by section 432.8. Under section 432.7, an employer may not ask a prospective employee about arrests that did *not* lead to a *conviction*, or information about a referral to and participation in any pretrial or posttrial diversion program. (*Id.*, subd. (a).) Section 432.8 expands section 432.7's prohibition by precluding an employer from asking questions regarding *convictions* for certain drug offenses more than two years old. For ease of reference, we will collectively refer to the statutes containing California's limitations on permissible questions as "section 432.7."

[2] The CMA was enacted as part of the USA Patriot Improvement and Reauthorization Act of 2005. (See Pub.L. No. 109-177, § 701 et seq. (Mar. 9, 2006) 120 Stat. 192, 256.)

I

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts*

Longs operates nearly 400 stores in California and, within each store, operates a pharmacy at which controlled substances are dispensed. Longs is required to license each of its pharmacies with the State of California and to register each pharmacy with the federal Drug Enforcement Administration (DEA). At each of the Longs stores, all employees have access to controlled substances and pseudoephedrine (a precursor chemical) with the opportunity to steal those substances. Longs also operates a wholesale distribution center registered with the DEA. At that facility, controlled substances are received and stored until reshipped to Longs retail stores. All employees of the wholesale distribution center are or may at times be involved in handling controlled substances.

During the class period, Longs's application for employment contained the following question concerning prior convictions: "Have you been convicted during the last seven years of a felony, a crime concerning use or possession of illegal drugs, or any misdemeanor which resulted in imprisonment?"[3]

In October 2004 Rankin completed an employment application containing the question. Rankin responded he had been convicted in the State of Washington of possession of fewer than 40 grams of marijuana.

### B. *The Lawsuit*

#### *Pretrial Proceedings*

Rankin filed this action seeking an award under section 432.7, alleging Longs violated section 432.7 by asking questions about certain prior convictions. In July 2005 the court granted Rankin's class certification motion, and defined the class as all individuals who submitted an employment application to Longs between October 13, 2003, and September 5, 2005 (the class period), containing the question. The class notice was sent to nearly 78,000 people, and fewer than 500 opted out of the class.

In several pretrial motions, Longs argued the federal Controlled Substances Act (21 U.S.C. §§ 801–904; CSA) and an implementing DEA regulation

---

[3] Longs's director of pharmacy compliance and senior vice-president of human resources testified they believed the question was appropriate based on applicable federal regulations and discussions with DEA officials.

(21 C.F.R. § 1301.76(a) (2005)) barred the application of section 432.7 to Longs under federal preemption principles. The trial court consistently rejected Longs's argument. However, shortly before trial, Congress enacted the CMA, which gives rise to the present appellate dispute.

### The CMA

■ On March 9, 2006, Congress enacted legislation that included the CMA. Among other things, the CMA amended the CSA to permit retail pharmacies to ask applicants whether they had ever been convicted of any crime involving controlled substances, "notwithstanding State law." (21 U.S.C. § 830(e)(1)(G).) Although some provisions of the CMA became effective 30 days after its enactment, numerous other provisions (including the provision regarding permissible questions) were expressly made effective "on and after September 30, 2006." (Pub.L. No. 109-177, § 711(b)(2)(B) (Mar. 9, 2006) 120 Stat. 192, 261.)

### Subsequent Trial and Posttrial Proceedings

In a writ petition to this court and in a renewed summary judgment motion in the trial court, Longs argued the CMA merely clarified (rather than substantively amended) existing law and therefore judgment should be entered in its favor under federal preemption principles. Rankin opposed both the writ petition and summary judgment motion, asserting the CMA changed (rather than clarified) existing law and therefore was a new law enacted subsequent to the class period and irrelevant to any federal preemption analysis. This court peremptorily denied the writ petition, and the trial court denied the summary judgment motion.

During the bench trial, the court denied Longs's renewed motion asserting federal preemption principles required judgment in its favor. Longs argued the CMA was intended to be declarative of existing law codified by the CSA and, because existing law permitted it to ask the question, federal preemption principles required judgment be entered in Longs's favor. However, the court expressed concern about imposing the penalties authorized under section 432.7 for Longs's prior employment applications, because of the CMA's express approval of identical conduct by Longs for all future applications. The trial court therefore invited further briefing and argument on this issue. After considering the parties' briefs and arguments on whether principles of abatement should apply, the trial court ruled that because the CMA now permits Longs to ask applicants about any convictions involving controlled substances, a judgment of dismissal should be entered in favor of Longs under abatement principles. Following entry of judgment for Longs, Rankin timely appealed.

## II

## CONTENTIONS ON APPEAL

Longs argues the trial court correctly found, when Congress adopted the CMA, it substituted a "right for a crime" within the meaning of *Hamm v. Rock Hill* (1964) 379 U.S. 306 [13 L.Ed.2d 300, 85 S.Ct. 384] (*Hamm*), and because the CMA does not contain an express saving clause, any action seeking a penalty for formerly prohibited conduct must be abated. Rankin argues abatement applies only when the Legislature intends its enactment to have retroactive application, and because the CMA was intended to apply prospectively only, it does not relieve Longs of liability for violations of section 432.7 that occurred several years before the effective date of the CMA.[4]

## III

## STANDARDS OF REVIEW

The parties agree that, after the effective date of the CMA, federal preemption principles preclude the application of section 432.7 to Longs because section 432.7's prohibition against employers asking prospective employees about certain drug-related convictions is in direct conflict with the CMA's provisions authorizing Longs to ask those questions. Instead, this appeal turns on the interpretation of the federal statutory scheme: was the relevant provision of the CMA intended to apply prospectively only, thereby precluding the application of abatement principles to a lawsuit seeking to hold Longs liable for conduct predating the enactment?

The interpretation of statutes presents questions of law subject to de novo review on appeal. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) When construing statutes or ascertaining legislative intent, an appellate court is not limited either by the trial court's interpretation or by the evidence presented on the issue below. (*City of Oakland v. Superior Court* (1996) 45 Cal.App.4th 740, 753 [53 Cal.Rptr.2d 120].)

■ We are guided by the fundamental precept that, when construing a statute, a court strives to ascertain and effectuate the Legislature's intent.

---

[4] Because of our conclusions, we do not reach the many alternative arguments raised by Longs. One of those alternative arguments—that a statutory award of over $15 million would offend due process—has prompted Rankin to file with this court a motion for judicial notice concerning Longs's financial condition. Because we do not reach Longs's due process claim, we deny Rankin's motion for judicial notice as moot.

(*People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708 [61 Cal.Rptr.3d 689, 161 P.3d 198].) We ascertain intent by looking first to the statutory language, giving it the usual and ordinary meaning, and if the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs. (*Id.* at p. 709.) However, where the statutory language is susceptible of more than one reasonable construction, we examine the context and apparent purposes of the statute to aid in ascertaining the legislative intent with the goal of adopting a construction that will effectuate that intent. (*Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 372 [64 Cal.Rptr.3d 434, 165 P.3d 154].)

IV

ANALYSIS

A familiar rule guiding courts when interpreting a statutory change is that, when the Legislature is silent on its intent, the new statutory scheme is ordinarily construed to operate prospectively rather than retroactively. This rule of construction, which finds expression in our statutes (Code Civ. Proc., § 3), may be rooted in concerns that retroactive application of new criminal laws may be barred by the ex post facto clause, and that retroactive application of new civil laws may offend due process considerations. (See generally *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 266–267 [128 L.Ed.2d 229, 114 S.Ct. 1483]; *County of San Bernardino v. Ranger Ins. Co.* (1995) 34 Cal.App.4th 1140, 1148–1149 [41 Cal.Rptr.2d 57].)

█ However, different considerations are implicated in the limited circumstances in which the Legislature enacts a statute that completely reverses substantive law by effectively permitting previously prohibited conduct. Those enactments, at least when they are devoid of an express saving clause declaring a legislative intent that the new enactment was not intended to release or extinguish penalties incurred for conduct occurring under the prior statutory regime, have led the courts to apply the common law principle of abatement to conclude all still pending actions brought under the old statute must be abated and dismissed. (*Hamm, supra*, 379 U.S. 306; *People v. Rossi* (1976) 18 Cal.3d 295 [134 Cal.Rptr. 64, 555 P.2d 1313] (*Rossi*).)

For example, in *Rossi*, the legislative act amended a law to remove all criminal sanctions for certain consensual sexual conduct and was unaccompanied by any express saving clause. The *Rossi* court held the legislation required abatement of a pending criminal action case for conduct proscribed when committed but no longer criminal. (*Rossi, supra*, 18 Cal.3d at pp. 298–304.) The court in *People v. Collins* (1978) 21 Cal.3d 208 [145

Cal.Rptr. 686, 577 P.2d 1026], explaining the underlying rationale for abatement, noted *Rossi* "held that when the Legislature repeals a criminal statute—or otherwise removes state sanctions from conduct formerly deemed criminal—its action requires the dismissal of pending criminal proceedings charging such conduct. Our holding in *Rossi* derived from the common law rule, early recognized in *Spears* v. *County of Modoc* (1894) 101 Cal. 303, 305 [35 P. 869], and often reaffirmed by this court, that the repeal of a criminal statute without a saving clause terminates all criminal prosecutions not reduced to final judgment. In *Sekt* v. *Justice's Court* (1945) 26 Cal.2d 297, 304 [159 P.2d 17, 167 A.L.R. 833], we discussed the rule's theoretical basis: it presumes the Legislature, by removing the proscription from specified conduct, intended to condone past acts." (*Collins*, at p. 212.)

When the Legislature enacts a statute that goes beyond merely removing criminal penalties for specified conduct, and instead expressly declares the formerly proscribed conduct is affirmatively permitted, the abatement principles apply with greater force. A statutory enactment that substituted a right for a crime, which "is a possibly unique phenomenon in legislation" (*Bell v. Maryland* (1964) 378 U.S. 226, 235 [12 L.Ed.2d 822, 84 S.Ct. 1814]), was examined by the court in *Hamm*. The defendants in *Hamm*, who had been convicted under a state trespass statute for conducting a "sit-in," argued their convictions should be overturned and all criminal proceedings should be dismissed because federal legislation (the Act), which did not become effective until after they had conducted the sit-in, declared that persons were entitled to engage in the conduct as a matter of right. (*Hamm, supra*, 379 U.S. at pp. 307–308.) *Hamm* concluded, because the Act had "substitute[d] a right for a crime" (*id.* at p. 314), the Act required abatement of all actions premised on the protected behavior, even absent legislative history or statutory language calling for retroactive application of the Act, because abatement "does not depend on the imputation of a specific intention to Congress in any particular statute. None of the cases cited drew on any reference to the problem in the legislative history or the language of the statute. Rather, the principle takes the more general form of imputing to Congress an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive. This general principle, expressed in the rule, is to be read wherever applicable as part of the background against which Congress acts. Thus, we deem it irrelevant that Congress made no allusion to the problem in enacting the Civil Rights Act." (*Id.* at pp. 313–314.)

Moreover, the court rejected the argument that abatement could be avoided by imputing the generic provisions of the federal saving statute (1 U.S.C. § 109) into every federal statute. *Hamm* noted the underlying purpose of the

federal saving statute, adopted in 1871, was "to obviate mere technical abatement such as that illustrated by the application of the rule in [*United States v. Tynen* (1871) 78 U.S. 88 [20 L.Ed. 153]]. There a substitution of a new statute with a greater schedule of penalties was held to abate the previous prosecution."[5] (*Hamm, supra*, 379 U.S. at p. 314.) The court concluded the general saving statute was inapplicable because, "[i]n contrast [to *Tynen*], the . . . Act works no such technical abatement. It substitutes a right for a crime. So drastic a change is well beyond the narrow language of amendment and repeal. It is clear, therefore, that if the convictions were under a federal statute they would be abated." (*Id.* at p. 314.)

*Hamm* then held the abatement principles applied with equal force to an action brought under state laws, reasoning: "Since the provisions of the Act would abate all federal prosecutions [for trespass] it follows that the same rule must prevail under the Supremacy Clause which requires that a contrary state practice or state statute must give way. Here the Act intervened before either of the judgments under attack was finalized. Just as in federal cases abatement must follow in these state prosecutions. Rather than a retroactive intrusion into state criminal law this is but the application of a long-standing federal rule, namely, that since the . . . Act substitutes a right for a crime any state statute, or its application, to the contrary must by virtue of the Supremacy Clause give way under the normal abatement rule covering pending convictions arising out of a pre-enactment activity. The great purpose of the civil rights legislation was to obliterate the effect of a distressing chapter of our history. This demands no less than the application of a normal rule of statutory construction to strike down pending convictions inconsistent with the purposes of the Act." (*Hamm, supra*, 379 U.S. at p. 315.)

Although *Hamm* and *Rossi* involved statutes that decriminalized conduct previously criminal, abatement principles have been applied with equal force in civil cases. (*Governing Board v. Mann* (1977) 18 Cal.3d 819,

[5] The purpose of general saving statutes—to avoid mere technical abatement—has more colorfully been described as reflecting an " 'antipathy' to 'amnesty' by 'inadverten[ce].' " (*U.S. v. Van Den Berg* (9th Cir. 1993) 5 F.3d 439, 443.) When the Legislature adopted amendments to laws that increased the penalties for specified conduct, the common law produced potentially absurd results: "[A]t common law when a statute was passed that *increased* the punishment for a crime, a defendant who committed the proscribed acts prior to the effective date of the new law could not be punished under the old law because it no longer existed, and he could not be punished under the new law because its attempted application would render it an ex post facto law. [Citation.] [¶] [General saving statutes were] enacted simply to authorize prosecutions under the former statute in order to avoid this technically absurd result by which a defendant could be prosecuted under no law, simply because the Legislature had decided to *increase* the punishment for his crime." (*Rossi, supra*, 18 Cal.3d at p. 299.)

830 [135 Cal.Rptr. 526, 558 P.2d 1] (*Mann*) ["[a]s a host of California cases demonstrate, . . . the reach of this common law rule has never been confined solely to criminal or quasi-criminal matters"].) Indeed, " '[a]lthough the courts normally construe statutes to operate prospectively, the courts correlatively hold under the common law that when a pending action rests solely on a statutory basis, and when no rights have vested under the statute, "a repeal of such a statute without a saving clause will terminate all pending actions based thereon." ' [Quoting *Mann*, at p. 829.] In other words, where 'the Legislature has conferred a remedy and withdraws it by amendment or repeal of the remedial statute, the new statutory scheme may be applied to pending actions without triggering retrospectivity concerns . . . .' [Quoting *Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 690 [10 Cal.Rptr.3d 702].]" (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1023 [35 Cal.Rptr.3d 487].)

The *Zipperer* court applied these principles when a 1979 legislative enactment, which had conferred certain statutory rights on the plaintiff, was partially repealed by a 2002 enactment nullifying those rights. The court, rejecting the plaintiffs' argument that they were entitled to pursue their pending action to collect under the 1979 statute for all injuries suffered prior to 2002, reasoned "[r]epeal of a remedial statute destroys a pending statutory action unless 'vested or contractual rights have arisen under' the statute[,] . . . [and in] this case, no such rights have arisen. . . . [P]laintiffs [do not] have any vested right in maintaining their statutory claim. ' "No person has a vested right in an unenforced statutory penalty or forfeiture." ' [Citations.] Until it is fully enforced, a statutory remedy is merely an ' "inchoate, incomplete, and unperfected" ' right, which is subject to legislative abolition." (*Zipperer v. County of Santa Clara, supra*, 133 Cal.App.4th at p. 1024, citation omitted.)

When a pending action seeks recovery based on a statutorily based obligation, and that statutory provision is repealed by legislation not containing an express saving clause, the California courts have consistently concluded the pending actions should be abated. This principle was applied in *Mann, supra*, 18 Cal.3d 819, in which a school district sought a determination that a teacher's marijuana conviction provided statutory grounds for dismissal but, while the judgment in the school district's favor was on appeal, the Legislature eliminated that conviction as a statutory basis for dismissal, and the Supreme Court concluded the school district's action should be abated. (*Id.* at pp. 829–831.) *Mann* cited an array of earlier cases applying this rule in the civil context (see *Mann, supra*, 18 Cal.3d at p. 830, fn. 8), and cases subsequent to *Mann* have continued to apply this rule. (See, e.g., *County*

*of San Bernardino v. Ranger Ins. Co., supra*, 34 Cal.App.4th at pp. 1148–1149 [repeal of statute providing for civil penalty or forfeiture running either to individual or state extinguishes right to recover under statute and applies to all cases not yet final]; *Zipperer v. County of Santa Clara, supra*, 133 Cal.App.4th at p. 1024.)

These principles convince us the CMA, by expressly authorizing Longs to ask applicants "whether they have been convicted of any crime involving or related to . . . controlled substances," and by conferring this privilege "notwithstanding State law" (21 U.S.C. § 830(e)(1)(G)), has substituted a federal right in place of a state statute banning those questions, within the meaning of *Hamm*. Because this partial repeal of California's statutory right was unaccompanied by any express saving clause, we conclude, under the line of cases represented by decisions like *Hamm*, *Rossi* and *Mann*, the trial court correctly ruled common law principles of abatement compelled a judgment dismissing Rankin's action.

Rankin asserts that all of the California cases applying abatement are inapposite because each is distinguishable in a critical aspect: the legislation repealing the former right or obligation had no saving clause. When there *is* an express saving clause, the courts will not apply abatement principles. (Cf. *People v. Floyd* (2003) 31 Cal.4th 179, 183 [1 Cal.Rptr.3d 885, 72 P.3d 820] [express declaration that " 'provisions shall be applied prospectively' " bars applying new laws to offenses committed before operative date].) Rankin, although conceding Congress did not insert an express saving clause into the CMA, argues abatement is not applicable "where the Legislature clearly signals its intent to make the amendment prospective, by inclusion of either an express saving clause *or its equivalent*." (*People v. Nasalga* (1996) 12 Cal.4th 784, 793 [50 Cal.Rptr.2d 88, 910 P.2d 1380], italics added, fn. omitted.) Rankin argues that Congress, by specifying the effective date for portions of the CMA (including 21 U.S.C. § 830(e)(1)(G)) that would be delayed approximately six months (see Pub.L. No. 109-177, § 711(b)(2)(B) (Mar. 9, 2006) 120 Stat. 192, 261), inserted the "equivalent" of a saving clause from which we may and should infer Congress intended the CMA would not be applied to pending actions.

Some federal courts have cited the delayed effective date for legislation as evidencing a legislative intent for prospective application. (See, e.g., *U.S. v. Brebner* (9th Cir. 1991) 951 F.2d 1017, 1022–1023.)[6] However, apart from

---

[6] *Brebner* concluded the delayed effective date of the provisions it was considering was sufficient to find an intent to apply the provisions prospectively. However, *Brebner* acknowledged that another federal court considering the *identical* provisions concluded those provisions operated retrospectively. (See *U.S. v. Brebner, supra*, 951 F.2d at p. 1023, fn. 5 [noting conflict between its conclusion and the holding in *U.S. v. Kolter* (11th Cir. 1988) 849 F.2d

dicta in some cases,[7] Rankin cites no California case holding the delayed effective date of a statutory repeal, standing alone, suffices as the type of clear signal of a legislative "intent to make the amendment prospective" (*People v. Nasalga, supra*, 12 Cal.4th at p. 793) that will preclude application of abatement principles. A sampling of the numerous cases in California applying abatement to legislative repeals of statutorily derived rights demonstrates abatement was applied even though the statutory repeal did not go into effect until some time after the legislation was adopted.

For example, despite a delayed effective date of the enactment considered in *County of San Bernardino v. Ranger Ins. Co., supra*, 34 Cal.App.4th 1140, that court held the subject enactment, which became effective after a delay because it was a nonurgency enactment (see Stats. 1994, ch. 649, § 1, pp. 3133–3136),[8] would be applied retroactively. Similarly, the court in *Mann* gave retroactive effect to a nonurgency enactment (see Stats. 1976, ch. 952,

541].) Rankin also relies on *Kaiser Aluminum & Chemical Corp. v. Bonjorno* (1990) 494 U.S. 827 [108 L.Ed.2d 842, 110 S.Ct. 1570] as holding that the delayed effective date of statutory changes shows an intent the provisions apply prospectively only. The *Kaiser* court, however, was not examining a statute that transformed formerly actionable conduct into nonactionable conduct, but instead addressed a change in the procedural remedies available to judgment creditors, e.g., a statute modifying how postjudgment interest would be calculated.

As we explained in *Brenton v. Metabolife Internat., Inc., supra*, 116 Cal.App.4th at page 689: "In contrast to changed substantive statutes, applying changed procedural statutes to the conduct of existing litigation, even though the litigation involves an underlying dispute that arose from conduct occurring before the effective date of the new statute, involves no improper retrospective application because the statute addresses conduct in the future. 'Such a statute " 'is not made retroactive merely because it draws upon facts existing prior to its enactment . . . . [Instead,] [t]he effect of such statutes is actually prospective in nature since they relate to the procedure to be followed in the future.['] " [Citation.] For this reason, we have said that "it is a misnomer to designate [such statutes] as having retrospective effect." [Citation.]' [Quoting *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 [279 Cal.Rptr. 592, 807 P.2d 434].] . . . ' "[T]he presumption against retrospective construction does not apply to statutes relating merely to remedies and modes of procedure. [Citation.] . . . [P]rocedural changes 'operate on existing causes of action and defenses, and it is a misnomer to designate them as having retrospective effect.' " ' " Thus, *Kaiser*'s holding provides no guidance on whether a statute that alters *substantive* law should be given only prospective application.

[7] Rankin cites *People v. Floyd, supra*, 31 Cal.4th at page 187, in which the court adverted to a delayed effective date as evidence the Legislature intended prospective application. However, the language was dicta, because the legislation, by incorporating an express saving clause declaring its " 'provisions shall be applied prospectively' " (*id.* at p. 185), showed it would not apply the new laws to offenses committed before its operative date. (Accord, *In re DeLong* (2001) 93 Cal.App.4th 562, 567 [113 Cal.Rptr.2d 385] [express declaration of prospectivity controls].) Moreover, *Floyd*'s reference to the import of a delayed effective date was qualified by its citation to *Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197 [105 Cal.Rptr.2d 407, 19 P.3d 1148], discussed later in this opinion, in which our Supreme Court examined why a delayed effective date provides a slender reed on which to infer a legislative intent of prospectivity.

[8] The effective date for nonurgency legislation is ordinarily delayed until January 1st of the year following enactment. (Cal. Const., art. IV, § 8, subd. (c)(1).)

pp. 2177–2180) despite its delayed effective date. The numerous cases cited by *Mann* that similarly gave retroactive effect to legislation (*Mann, supra*, 18 Cal.3d at p. 830, fn. 8) contain no suggestion the delayed effective date of the enactment was relevant to determining whether the Legislature intended that enactment to have only prospective application. Of course, where the law expressly states it applies prospectively only (see, e.g., *Talley v. Municipal Court* (1978) 87 Cal.App.3d 109, 113 [150 Cal.Rptr. 743]) or has a delayed effective date and is coupled with contemporaneous legislative enactments that effectively preclude any retroactive operation (see, e.g., *County of Alameda v. Kuchel* (1948) 32 Cal.2d 193, 196–199 [195 P.2d 17]), the law will be construed as having only prospective operation. (*Ibid.*) However, there is no internal impediment that would necessarily create internal inconsistencies if portions of the CMA are applied prospectively while other aspects are applied to pending actions.

Moreover, the reason for delaying the effective date for the provisions of title 21 United States Code section 830(e)(1) are explicable for numerous reasons other than an intent to have those provisions apply prospectively. As explained by the court in *Preston v. State Bd. of Equalization, supra*, 25 Cal.4th 197, 223–224: "[T]he postponement of the operative date of the legislation . . . does not mean that the Legislature intended to limit its application to transactions occurring after that date. . . . The Legislature may [delay the operative date] for reasons other than an intent to give the statute prospective effect. For example, the Legislature may delay the operation of a statute to allow 'persons and agencies affected by it to become aware of its existence and to comply with its terms.' [Citation.] In addition, the Legislature may wish 'to give lead time to the governmental authorities to establish machinery for the operation of or implementation of the new law.' [Citation.] A later operative date may also 'provide time for emergency clean-up amendments and the passage of interrelated legislation.' [Citation.] Finally, a later operative date may simply be 'a date of convenience . . . for bookkeeping, retirement or other reasons.' [Citation.] [¶] In this case, the Legislature gave no rationale for the postponement. Thus, it may have postponed the operative date for reasons *other than* an intent to give [the legislation] prospective effect. For example, the Legislature may have wished to give the Board time to enact new regulations for the 1993 tax year or to settle ongoing tax disputes prior to the implementation of the legislation. The Legislature also may have anticipated possible cleanup amendments . . . . In any event, where, as here, compelling indicators of the Legislature's intent to give a statute retrospective effect exist, the mere postponement of the statute's operative date is not enough to negate these indicators. (See *Tevis v. City & County of San Francisco* (1954) 43 Cal.2d 190, 194–196 [272 P.2d 757]

[a charter amendment has retrospective effect even though the amendment delayed its effective date].)"

Here, title 21 United States Code section 830(e)(1) contains numerous administrative requirements apart from permitting registrants to inquire about former convictions: it imposes "behind-the-counter" access and "logbook" requirements for certain drugs (*id.*, subd. (e)(1)(A)); it imposes additional training requirements for sales personnel and certification requirements for sellers (*id.*, subd. (e)(1)(B)); and it requires the Attorney General to develop regulations to protect the privacy interests of consumers (*id.*, subd. (e)(1)(C)). The delayed effective date for those provisions is consistent with the goals of allowing " 'persons and agencies affected by it to become aware of its existence and to comply with its terms' " (*Preston v. State Bd. of Equalization, supra,* 25 Cal.4th at p. 223) and " 'to give lead time to the governmental authorities to establish machinery for the operation of or implementation of the new law' " (*id.* at pp. 223–224), but does not necessarily evidence a clear intent to have all of its provisions operate prospectively only. The fact Congress delayed the effective date for certain provisions of the CMA provides little guidance on the issue of abatement.

■ Rankin also asserts the federal general saving statute precludes the application of abatement principles in this case. We are not persuaded by Rankin's argument because it appears the underlying purposes of general saving statutes render them inapplicable here. The general saving statutes in the federal system (see 1 U.S.C. § 109) did not impede *Hamm*'s determination that the new legislation should apply to pending actions because *Hamm* recognized the general saving statute focused on avoiding technical abatements while the legislation before it did not involve any inadvertent amnesty. (*Hamm, supra,* 379 U.S. at p. 314.) Similarly, *Rossi* concluded the California general saving statute (see Gov. Code, § 9608) was no impediment to applying the new legislation to a pending action. (*Rossi, supra,* 18 Cal.3d at pp. 299–300.) In both cases, the courts recognized that because the purposes of general saving statutes—to prevent " 'amnesty' by 'inadverten[ce]' " (*U.S. v. Van Den Berg, supra,* 5 F.3d at p. 443)—are not implicated when the statutory enactment legitimizes previously unlawful conduct, the general saving statutes should not be automatically incorporated by implication into new enactments declaring previously actionable conduct no longer actionable. Because the CMA expressly and intentionally insulates certain conduct from state law sanctions, as did the legislation in *Hamm* and *Rossi*, we are not persuaded by Rankin's claim that the general saving statutes preclude the application of abatement principles in this case.

Rankin, arguing *Hamm* was sui generis and should not be extended beyond the Civil Rights Act of 1964 (Pub.L. No. 88-352 (July 2, 1964) 78 Stat. 241) it considered, cites several post-*Hamm* cases purportedly holding that an action seeking to hold person liable for engaging in statutorily prohibited conduct need not be abated notwithstanding subsequent legislation removing the statutory prohibition on such conduct. These cases do not support Rankin's effort to confine *Hamm* to its facts. For example, Rankin argues that *U.S. v. Van Den Berg, supra*, 5 F.3d 439 held the legalization of conduct does not abate prosecutions for activities unlawful under the prior statutory scheme. However, *Van Den Berg* involved unique legislation: the law criminalized trade with South Africa but provided the ban would automatically terminate if the government of South Africa took certain steps. (*Id.* at p. 440.) When the executive branch certified such steps had been taken and the ban therefore lapsed, the issue was whether a person who had violated the ban could nevertheless be prosecuted. The court concluded the legislation was a "temporary statute" within the meaning of the general saving clause, which provides that the *"expiration of a temporary statute* shall not have the effect to release or extinguish any penalty . . . incurred under such statute." (*Id.* at pp. 441–443.) Moreover, *Van Den Berg* concluded abatement was not required under *Hamm* because *Hamm* involved legislation that expressly repudiated a former prohibition (e.g., criminal prosecutions for sit-ins) in favor of conferring a right to engage in sit-ins. In contrast, the legislation under consideration in *Van Den Berg* did not represent congressional legislation "repudiat[ing] the merits of a prior public policy. [The legislation] was designed to bring about changes to South Africa's internal policies. The sanctions were terminated only after President Bush determined that they had succeeded. Van Den Berg may well be correct that Congress intended to encourage investment in South Africa *after* the lifting of the sanctions. However, there is simply no reason to think that it intended to give amnesty to persons who had violated the sanctions *while* they were in effect and thus helped to prolong the reason for their existence. The *Hamm* rationale in favor of abatement is inapplicable here." (*Id.* at pp. 444–445.) Thus, *Van Den Berg* held the prosecution could be pursued because the legislation targeted conduct that occurred during a finite and temporary time period, and the purposes of Congress would have been frustrated if those persons targeted by the enactment could escape punishment precisely because of its temporary nature. In contrast, the CMA did not impose a temporary ban on conduct Longs violated during its lifespan; instead, the CMA has declared that formerly prohibited conduct is now lawful. We believe this case falls within *Hamm* and beyond the limited confines of *Van Den Berg*.

Rankin's reliance on *Pipefitters v. United States* (1972) 407 U.S. 385 [33 L.Ed.2d 11, 92 S.Ct. 2247] is also not persuasive. Although Rankin asserts *Pipefitters* held that rendering permissible certain previously unlawful

acts does not substitute a right for a crime so that continued prosecution for the former conduct is abated, *Pipefitters* expressly stated abatement was inappropriate because the amendment "does not . . . '[substitute] a right for a crime.' To the contrary, . . . [the amendment] retains the basic offense— contributions or expenditures by labor organizations . . . are still forbidden so long as they are paid for from actual or effective dues or assessments. We therefore hold that even if there has been an implied repeal of [the former statute], petitioners remain punishable under that provision." (*Id.* at pp. 434–435.) In contrast to the *Pipefitters* legislation, which retained the criminality of the conduct, the CMA (as did the legislation in *Hamm*) eliminated any liability for the formerly proscribed conduct, and therefore *Pipefitters* does not support Rankin's claim that abatement is inapplicable here.

Rankin's reliance on *United States v. Ross* (2d Cir. 1972) 464 F.2d 376 for the proposition that abatement under *Hamm* does not apply to statutory enactments not substituting a substantive right for a crime, is equally unpersuasive. First, *Ross* declined to apply the new statute because the new enactment "specifically provided that '[p]rosecutions for any violation of the law occurring prior to . . . [May 1, 1971] shall not be affected by the [repeal] . . . [of the former law] . . . or abated by reason thereof.' " (*Ross*, at p. 379.) Second, the enactment in *Ross* did not *decriminalize* the underlying conduct, but only adopted different *sentencing* considerations. (*Id.* at p. 380.) The CMA, in contrast, changed the underlying conduct from condemned to condoned and contained no express anti-abatement clause, rendering *Ross* inapposite here.

 In the present case, Congress has replaced California's prohibition against asking about a certain class of prior convictions with an express right to ask about those convictions, thereby effecting a partial repeal of the remedial statute that forms the basis for this action, and did so without any express saving clause. As in *Zipperer v. County of Santa Clara, supra,* 133 Cal.App.4th 1013, this "[r]epeal of a remedial statute destroys a pending statutory action unless 'vested or contractual rights have arisen under' the statute[,] . . . [and in] this case, no such rights have arisen. . . . [P]laintiffs [do not] have any vested right in maintaining their statutory claim. ' "No person has a vested right in an unenforced statutory penalty or forfeiture." ' [Citations.] Until it is fully enforced, a statutory remedy is merely an ' "inchoate, incomplete, and unperfected" ' right, which is subject to legislative abolition." (*Id.* at p. 1024, citation omitted.) We conclude, as did the courts in *Hamm,* *Rossi* and *Mann,* that Rankin's pending action to enforce the repealed statutory remedy is abated, and therefore we affirm the trial court's judgment dismissing the action.

## DISPOSITION

The judgment is affirmed. Defendant is entitled to costs on appeal.

Benke, Acting P. J., and Irion, J., concurred.