Filed 5/4/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LILLIAN MORRIS, <br><br>     Plaintiff and Appellant, <br><br>              v. <br><br> JPMORGAN CHASE BANK, N.A., et al., <br><br>     Defendants and Respondents. | A155027 <br><br> (Contra Costa County Super. Ct. No. C17-02098) |

This long-running story begins in 2008 when plaintiff Lillian Morris, facing straitened financial circumstances, fell into default on her home mortgage. After negotiating a loan modification with the original lender, she once again defaulted in 2009. Morris and her late husband, Ashraf Mazhari, then filed two bankruptcy proceedings, and through those proceedings staved off foreclosure for a number of years. Mazhari died while the second bankruptcy was pending, further compromising Morris's financial condition and exposing her once again to foreclosure. Morris, on her own, tried to obtain another loan modification, but was unsuccessful.

Following the lifting of the automatic stay in a third bankruptcy in 2016, Morris's home was sold at public auction to JPMorgan Chase Bank, N.A. (Chase), the deed of trust beneficiary and successor to the original

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.E.–G.

lender.  In this lawsuit, Morris claims that the trustee's sale occurred without notice to her.  Her core allegation is that Chase and then Rushmore Management Services, LLC (Rushmore), the loan servicer at the time of the trustee's sale, pursued foreclosure secretly while giving her false assurances that loan modification terms were forthcoming and shuttling her back and forth between uninformed representatives who gave her inconsistent information about the status of her modification request.  She claims she would have qualified for a modification, and avoided foreclosure, had Chase and Rushmore dealt with her in good faith.

The operative complaint seeks various forms of postforeclosure relief, including damages, an order setting aside the trustee's sale, and a declaration quieting title.  The complaint pleads 11 causes of action against Chase, Rushmore, and the subsequent purchaser of the home from Chase following the foreclosure, U.S. Bank, N.A. (U.S. Bank) (collectively, the defendants).  Without detailing them all at this point, suffice it to say that Morris pleads these causes of action under the California Homeowner Bill of Rights (HBOR) (Civ. Code,[1] §§ 2923.6, 2923.7) and sundry other statutory (§ 2924b; Bus. & Prof. Code, § 17200), common law and equitable (negligence, voiding of trustee's sale, quiet title) theories.  The story ends in 2018—at least so far—with the trial court sustaining the defendants' demurrers without leave to amend as to all claims.

After another lengthy delay occasioned by yet another bankruptcy, Morris now appeals.  She limits the appeal to seven of her 11 causes of action. We reverse in part and affirm in part.  In the published portion of this opinion, we reverse with directions that the trial court enter a new and different order overruling the demurrers to the first cause of action alleging

---

[1] Statutory references are to the Civil Code unless otherwise indicated.

2

failure to appoint a single point of contact (§ 2923.7), the second cause of action alleging dual tracking (§ 2923.6), and the third cause of action alleging failure to mail upon request a notice of default and notice of trustee's sale (§ 2924b). In the unpublished portion of the opinion, we affirm on the remaining four causes of action.

## I. BACKGROUND

### A. *Initial Complaint*

Morris filed her initial complaint against Chase, Rushmore, and U.S. Bank in November 2017. Since the allegations that she later made by amendment are important to our analysis, we begin by placing the amendments in context against a baseline recitation of the facts as originally pleaded, read together with the exhibits attached to the complaint, and with various publicly filed documents that were judicially noticed at the defendants' request.

In October 2005, Morris borrowed $934,500 from Washington Mutual Bank, F.A. (WaMu) secured by a deed of trust on her home in Lafayette. This was a refinance of a prior $535,000 loan with WaMu taken out in 1993. With her late husband, Morris lived in the home as a primary residence beginning in 1993. Morris legally changed her name in February 2005 from Shams Azar Tehrani Mazhari, which is the name shown on the title documents to the home. Over the course of the next decade, Morris defaulted; obtained a loan modification from WaMu, defaulted again, and filed for chapter 11 bankruptcy twice, preventing foreclosure while the bankruptcies were pending; WaMu went into receivership and assigned Morris's mortgage loan and deed of trust to the Federal Deposit Insurance Corporation (FDIC); and Chase, by assignment from the FDIC, stepped into WaMu's shoes as mortgagee and deed of trust beneficiary.

In early 2015 Morris applied to Chase for a loan modification. Since English is not Morris's native language, she hired an agent to assist her in communicating with Chase. But Chase took the position that she "did not need an agent and she should deal with Chase directly." "[E]very time she called asking for assistance," "[e]ach representative kept asking [Morris for] the same information and the same documents [she had] previously submitted with no progress in the status of [her] request for assistance." Whenever Morris called Chase to ask about the status of her application, she was "shuffled from one representative to another." In the course of being given the "runaround," she was given "false and inconsistent information about [her] rights" and "led to believe that her foreclosure alternative requests were being considered, and that her home would not be sold until there was a determination on her loss mitigation requests." "Chase's representatives kept providing [Morris] with positive statements and reassurances that [she] would obtain a loan modification," yet apparently denied her loan modification application at some point, without saying why. Morris admits she was verbally advised of the denial "[a]t an unknown time." But she was never given any reasons for the denial and she "never received a denial letter in writing" advising her that she had a right to appeal.

In April 2015, Chase recorded a notice of default against Morris's home for past due payments under the loan of $38,504.82, and foreclosure proceedings began. In August 2015, Chase recorded a notice of trustee's sale, noticing a foreclosure sale for September 10, 2015. One week before the scheduled foreclosure sale, Morris filed her third chapter 11 bankruptcy petition. In February 2016, the third bankruptcy case was converted to a chapter 7 proceeding. In May 2016, the bankruptcy court granted Chase relief from the automatic stay. And in September 2016, Chase recorded a

4

notice of trustee's sale for October 18, 2016. The scheduled October 18, 2016 date of sale designated in the recorded September 2016 notice of sale was later postponed to April 27, 2017.[2]

In March 2017, Chase assigned its rights as servicer of the mortgage to Rushmore. After the change in servicer, Morris spoke to a person at Rushmore who was "rude to her" and said she needed to speak to a person named "Vivian," who proved to be unreachable. The day before the further postponed foreclosure sale scheduled for late April 2017, Morris filed a lawsuit against Chase and Rushmore for, among other things, violation of the HBOR and the unfair competition law (UCL).[3] A trustee's deed upon sale was recorded May 4, 2017. Morris learned of the sale after it had already occurred, from a real estate broker and from her then counsel. She withdrew her lawsuit after the sale took place, and the property was resold to U.S. Bank weeks later, on July 6, 2017. There is no indication in the record

---

[2] The first postponement, from September 15, 2015 to October 16, 2016, clearly took place as a result of a pending bankruptcy stay. (§ 2924g, subd. (e).) It is not clear from the record why the second postponement, from October 16, 2016 to April 27, 2017, took place. Presumably, it occurred at Chase's initiative. (See § 2924g, subd. (c)(1)(D) [postponements of foreclosure sales for periods of less than 365 days authorized at the discretion of the trustee].)

[3] In her opening brief on appeal, Morris points out that, three days before the foreclosure sale on April 27, 2017, she received a letter from Rushmore denying her loan modification application, but giving no reasons for the denial. She attaches the letter as an extra-record exhibit to her brief in violation of rule 8.204(d) of the California Rules of Court. Because the receipt of this denial letter was not alleged in Morris's complaint, because it was neither brought to the attention of the trial court nor properly placed into the record on appeal by request for augmentation, we have not considered it.

5

that U.S. Bank had notice of the statutory violations Morris alleges took place prior to its purchase of the property.

Morris's original complaint in this case, filed on November 7, 2017, renews and expands upon the allegations she made in her abandoned lawsuit earlier that year. It recites the history of Morris's failed attempt to obtain a loan modification from Chase and Rushmore, and alleges generally that she "did everything she could to save her home, but she . . . lost her home because of Defendants' negligent handling and misrepresentations regarding her account." "[H]ad Defendants properly reviewed [her] loan modification and loss mitigation requests in a timely manner," she alleges, "[she] would have either been approved for a loan modification, or would have pursued other foreclosure alternatives, such as reinstating their Note, or a short sale."

The original complaint names all three defendants and alleges 11 causes of action against each of them. The first and second causes of action, pleaded on HBOR theories, allege Chase and Rushmore (1) failed to assign a single point of contact (§ 2923.7, subds. (a)–(e); Stats. 2012, ch. 86, § 9; Stats. 2012, ch. 87, § 9), and (2) recorded a notice of default or notice of sale or conducted a foreclosure sale while a "complete application" for a loan modification was pending, a practice sometimes called "dual tracking" (§ 2923.6, subds. (c) & (f); Stats. 2012, ch. 87, § 7). The third cause of action alleges Chase failed to mail Morris—by registered or certified mail (§ 2924b), or by any other means—a copy of a notice of default filed in April 2015 or a copy of the notice of trustee's sale recorded in September 2016. The fourth cause of action pleads negligence; the eighth cause of action seeks to set aside the trustee's sale; the ninth cause of action seeks to quiet title; and the eleventh cause of action alleges unlawful, unfair or fraudulent business practices under the UCL (Bus. & Prof. Code, § 17200 et seq.).

6

**B.** *First Demurrer*

Rushmore and U.S. Bank jointly filed a general demurrer, and the trial court sustained it as to all causes of action, with leave to amend.[4] Ruling on the demurrer in January 2018, the court identified several specific deficiencies in the complaint and granted leave to amend. The trial court noted that Morris's alleged HBOR causes of action were "vague as to time" and "caution[ed]" Morris that, for the HBOR to apply, she would need to allege she was not in active bankruptcy during the relevant time because section 2920.5, subdivision (c)(2)(C) excludes an individual who is pursuing such a proceeding from the definition of a "borrower" authorized to bring claims asserting HBOR violations.

After pointing out this vagueness defect, the court went on to sustain the demurrer as to each cause of action on various additional grounds, including failure to allege a "material violation" of the HBOR and "actual economic damages" (the first and second causes of action); failure to make any specific allegations against Rushmore or U.S. Bank (the first, second, third, and fourth causes of action); failure to allege any conduct that caused her default (the fourth cause of action); failure to allege tender of funds sufficient to pay off the secured loan delinquency, or an exception to the tender rule (the eighth and ninth causes of action); failure to allege any unlawful conduct can be differentiated from her defective HBOR claims and failure to plead economic injury (the eleventh cause of action).

---

[4] In support of their jointly filed demurrer, Rushmore and U.S. Bank also filed a voluminous request for judicial notice of 17 exhibits, consisting of 200 pages of publicly available records. These documents included docket sheets from Morris's various bankruptcies that provided a detailed chronology of those proceedings.

7

On all causes of action, the trial court made clear it would give Morris just "one final opportunity to amend" to cure the identified deficiencies.

## C. *First Amended Complaint*

On February 2, 2018, Morris filed the operative first amended complaint. The causes of action pleaded in the first amended complaint were more specifically targeted than in the initial complaint; Morris limited the third (§ 2924b) to Chase alone, and the first (§ 2923.7), second (§ 2923.6), and eleventh (Bus. & Prof. Code, § 17200 et seq.) to Chase and Rushmore, while continuing to name all three defendants on the fourth (negligence), eighth (set aside of trustee's sale) and ninth (quiet title). The first amended complaint also realleged the facts set forth in the initial complaint, but supplemented them in certain ways. Morris specifically alleged for the first time, for example, that over the years she lived in her Lafayette home, she "spent a significant amount of money renovating the property including painting the house, placing gates on the property, improving the plumbing, [and] installing new floors and tiles," all of which she alleged "considerably increased the value of the property." She also specifically tied her allegations concerning the failure to appoint a single point of contact to her allegation concerning her failure to tender the past due amount necessary to redeem her loan, alleging for the first time that the inconsistent information she received from allegedly incompetent and uninformed servicing representatives deprived her of the opportunity to tender funds to pay off her loan.

The primary addition to the facts Morris alleged in the first amended complaint had to do with Rushmore's conduct in 2017, following its appointment as loan servicer. To the background facts and to every cause of action pleaded specifically against Chase and Rushmore, Morris added greater particularity to the allegations describing how she was treated by Rushmore. She alleged that once again she was "shuffled from" person to

8

person and that she was given "inconsistent information" by Rushmore representatives who were "unable to provide a status update as to her . . . pending loan modification review." She alleged, for example, that representatives of Rushmore told her, on the one hand, it was her responsibility to retrieve her loan modification application from Chase and they would review it when she sent it to them, while on the other hand, that her loan modification was under active review. She also alleged specific assurances from a Rushmore representative that, while her modification application was pending, they would not proceed with a trustee's sale, which was untrue since, she claims, Rushmore was simultaneously pursuing the foreclosure process.

### D. *Second Round of Demurrers*

In response to the first amended complaint, all three defendants filed general demurrers, Chase for the first time, and Rushmore and U.S. Bank for the second time, again jointly. Both demurrers argued that Morris failed to cure the deficiencies identified in the trial court's prior ruling and presented some new arguments why the amended complaint was subject to demurrer.

The trial court sustained the demurrers, this time without leave to amend.[5] On Morris's HBOR claims, the court concluded the amended complaint did "nothing to address the statutory exclusion under HBOR for persons in bankruptcy." In addition, the court sustained the demurrer on the HBOR causes of action because the amended complaint still failed to allege a "material violation" of sections 2923.6 and 2923.7 and failed to allege "actual economic damages" caused by the alleged violations, as required for recovery

---

[5] The court granted judicial notice requests from Chase and Rushmore asking it to notice the same publicly available records from the dockets of Morris's several bankruptcies that were judicially noticed in connection with the first demurrer.

9

of money damages under the HBOR after a foreclosure has occurred. (§ 2924.12, subd. (b).) The court also ruled that the dual tracking claim under section 2923.6 was abated. For the third cause of action under section 2924b, "[d]espite [Morris's] prior opportunity to amend," she again failed to "make any allegations with respect to any specific Defendant." On the fourth cause of action for negligence, the trial court ruled that the amended complaint remained vague about which party allegedly did what, and that Morris failed "to allege how any of the alleged negligent conduct cause[d] [her] default."

On the eighth (to set aside trustee's sale) and ninth (quiet title) causes of action, the trial court concluded that Morris's allegation in the amended complaint that "she was 'willing and able to tender funds' . . . is not tantamount to an allegation that she actually offered to pay the full amount of the debt" in compliance with the tender rule. It also ruled there were no allegations supporting an exception to the tender rule. Finally, the trial court ruled that the eleventh cause of action for unlawful or unfair business practices failed because the amended complaint was "bereft of allegations which would demonstrate economic injury and causation."

Based on orders sustaining the demurrers without leave to amend, the trial court entered judgments of dismissal with prejudice in favor of all defendants in June 2018.

Morris appealed in August 2018 and in February 2019 filed a fourth petition in bankruptcy court, which, together with a bankruptcy appeal, delayed further prosecution of the appeal in this case until August 2020. Defendants moved to dismiss the appeal for failure to timely procure the record, but we declined to dismiss it and now address it on the merits.

# II. DISCUSSION

## A. *Standards of Review*

"The absence of any allegation essential to a cause of action renders it vulnerable to a general demurrer.  A ruling on a general demurrer is thus a method of deciding the merits of the cause of action on assumed facts without a trial." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 437, fn. 4.) "Conversely, a general demurrer will be overruled if the complaint contains allegations of every fact essential to the statement of a cause of action, regardless of mistaken theory or imperfections of form that make it subject to special demurrer." (5 Witkin, Cal. Proc. (6th ed. 2021) Pleading, § 951, p. 351.)

"A complaint, with certain exceptions, need only contain a 'statement of the facts constituting the cause of action, in ordinary and concise language' (Code Civ. Proc., § 425.10, subd. (a)(1)) and will be upheld ' "so long as [it] gives notice of the issues sufficient to enable preparation of a defense." ' [Citation.]  '[T]o withstand a demurrer, a complaint must allege ultimate facts, not evidentiary facts or conclusions of law.' [Citation.]  However, ' "[t]he fact that a party has alleged more than is required to justify his right does not obligate him to prove more than is essential, and the unnecessary allegations will be treated as surplusage unless the opposing party would be prejudiced." ' [Citation.]  At some point, of course, there is a remedy for undue prolixity:  a demurrer for uncertainty.  (Code Civ. Proc., § 430.10, subd. (f).) But 'demurrers for uncertainty are disfavored, and are granted only if the pleading is so incomprehensible that a defendant cannot reasonably respond.' [Citation.]" (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 848, fn. 3.)

We apply two standards of review on appeal from a judgment of dismissal after a demurrer is sustained without leave to amend. (*Aguilera v. Heiman* (2009) 174 Cal.App.4th 590, 595.)

First, we review the operative complaint "de novo to determine whether the complaint alleges facts sufficient to state a cause of action under any legal theory or to determine whether the trial court erroneously sustained the demurrer as a matter of law." (*Ibid.*; see *Fox v. JAMDAT Mobile, Inc.* (2010) 185 Cal.App.4th 1068, 1078.) We give the complaint a reasonable interpretation and treat the demurrer as admitting all material facts properly pleaded that are not inconsistent with other allegations, exhibits, or judicially noticed facts. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Genis v. Schainbaum* (2021) 66 Cal.App.5th 1007, 1014–1015.) We need not accept as true, however, deductions, contentions or conclusions of law or fact. (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318; *Fox v. JAMDAT Mobile, Inc.*, *supra*, 185 Cal.App.4th at p. 1078.)

Second, we determine "whether the trial court abused its discretion by sustaining the demurrer without leave to amend." (*Aguilera v. Heiman*, *supra*, 174 Cal.App.4th at p. 595.) Abuse of discretion is established when " 'there is a reasonable possibility the plaintiff could cure the defect with an amendment.' " (*Ibid.*; accord, *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) Under both standards, the plaintiff has the burden of demonstrating trial court error. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.)

## B. *Legal Landscape*

### 1. Nonjudicial Foreclosure

We begin with an overview of some background principles governing nonjudicial foreclosure sales.

"A deed of trust to real property acting as security for a loan typically has three parties:  the trustor (borrower), the beneficiary (lender), and the trustee.  'The trustee holds a power of sale.  If the debtor defaults on the loan, the beneficiary may demand that the trustee conduct a nonjudicial foreclosure sale.'  [Citation.]  The nonjudicial foreclosure system is designed to provide the lender-beneficiary with an inexpensive and efficient remedy against a defaulting borrower, while protecting the borrower from wrongful loss of the property and ensuring that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser."  (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 926 (*Yvanova*).)

"During the foreclosure process, the debtor/trustor is given several opportunities to cure the default and avoid the loss of the property.  First, the trustor is entitled to a period of reinstatement to make the back payments and reinstate the terms of the loan.  [Citation.]  This period of reinstatement continues until five business days prior to the date of the sale, including any postponement.  (Civ. Code, § 2924c, subds. (a)(1), (e).)  In addition to the right of reinstatement, the trustor also possesses an equity of redemption, which permits the trustor to pay all sums due prior to the sale of the property at foreclosure and thus avoid the sale.  (Civ. Code, §§ 2903, 2905.)"  (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830–831 (*Moeller*); see *Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 814.)

"As a general rule, the purchaser at a nonjudicial foreclosure sale receives title under a trustee's deed free and clear of any right, title or interest of the trustor. . . . A properly conducted nonjudicial foreclosure sale constitutes a final adjudication of the rights of the borrower and lender. . . . [¶] The purchaser at a foreclosure sale takes title by a trustee's deed.  If the trustee's deed recites that all statutory notice requirements and procedures

13

required by law for the conduct of the foreclosure have been satisfied, a rebuttable presumption arises that the sale has been conducted regularly and properly." (*Moeller*, *supra*, 25 Cal.App.4th at pp. 830–831, citations omitted.) In a postforeclosure challenge, "this presumption is conclusive as to a bona fide purchaser" for value at the trustee's sale. (*Id.* at p. 831.)

California's system of nonjudicial foreclosure has long been governed by a detailed scheme of statutes (§§ 2920–2923, 2924 et seq.) that evolved over time from the original legislative grant of power to conduct trustee sales in the late 1920's. (§ 2924a; see Stats. 1929, ch. 610, § 1, p. 1019.) The system is founded upon and presupposes adequate—and thus constitutionally valid—presale notice. (§ 2924b; see *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 274–275.) "Basically, [the statutes] require that before the trustee, acting under a power of sale contained in the deed of trust, can sell the subject trust property, the trustee must first record a notice of default setting forth the nature of the default and the election to exercise the power of sale" at a specified place and time. (*Garfinkle*, at pp. 274–275 & fn. 7.) And within 10 business days following the recording of a notice of default, the "mortgagee, trustee, or other person authorized to record the notice of default or the notice of sale" must mail a copy of the notice of default to the trustor or mortgagor at the address specified in the recorded request or in the deed of trust. (§ 2924b, subd. (b).)

Even though the validity of the sale is conclusively presumed as against a bona fide purchaser so long as the deed recites the necessary formalities, the presumption is rebuttable in a postforeclosure case against the trustee or mortgagee upon a showing that the trustee's sale was procedurally irregular. (*Munger v. Moore* (1970) 11 Cal.App.3d 1, 5–9.) "The 'traditional method' to challenge a nonjudicial foreclosure sale 'is a suit in

14

equity . . . to have the sale set aside and to have the title restored.' " (*Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 10–11.)  In support of such a claim, "[t]hree elements must be proven:  '(1) the trustee . . . caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a . . . deed of trust; (2) the party attacking the sale suffered prejudice or harm; and (3) the trustor . . . tenders the amount of the secured indebtedness or was excused from tendering.' " (*Ibid.*)  In addition, " '[A] trustee or mortgagee may be liable to the trustor or mortgagor for damages sustained where there has been an illegal, fraudulent or wil[l]fully oppressive sale of property under a power of sale contained in a mortgage or deed of trust.' " (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408.)  " 'This rule of liability is [founded] . . . upon the basic principle of tort liability declared in the Civil Code that every person is bound by law not to injure the person or property of another or infringe on any of his rights.' " (*Ibid.*)  "To successfully challenge a foreclosure sale based on a procedural irregularity," in an action at law or in equity, "the plaintiff must show both that there was a failure to comply with the procedural requirements for the foreclosure sale and that the irregularity prejudiced the plaintiff." (*Citrus El Dorado, LLC v. Chicago Title Co.* (2019) 32 Cal.App.5th 943, 950.)  "[M]ere technical violations of the foreclosure process will not" suffice. (*Miles*, at p. 409.)

### 2.  The HBOR

Layered on top of this foundational scheme of statutory, common law and equitable rights and remedies is the HBOR, a complex set of enactments focused specifically on residential mortgages and passed as a legislative response to the ongoing mortgage foreclosure crisis in 2012.  (§§ 2920.5, 2923.4–2923.7, 2924, 2924.9–2924.12, 2924.15, 2924.17–2924.20; Stats. 2012, ch. 86, §§ 2–23; Stats. 2012, ch. 87, §§ 2–23.)  The HBOR is principally

15

designed to ensure that "as part of the nonjudicial foreclosure process, borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options, if any, offered by or through the borrower's mortgage servicer, such as loan modifications or other alternatives to foreclosure." (§ 2923.4; see *Lucioni v. Bank of America, N.A.* (2016) 3 Cal.App.5th 150, 157–158; *Valbuena v. Ocwen Loan Servicing, LLC* (2015) 237 Cal.App.4th 1267, 1272.) The HBOR lays out a carefully calibrated enforcement mechanism. (*Lucioni*, at pp. 158–159.) For "material violation" of any one of a list of nine statutory provisions within its scheme, it authorizes preforeclosure injunctive relief (§ 2924.12, subd. (a)(1); § 2924.19, subd. (a)(1)); postforeclosure claims for "actual economic damages pursuant to Section 3281" (§ 2924.12, subd. (b); § 2924.19, subd. (b))[6]; the greater of trebled damages or $50,000 where the violation was "intentional or reckless" or "resulted from willful misconduct" (§ 2924.12, subd. (b); § 2924.19, subd. (b)); and attorney fees and costs as a reward to prevailing claimants (§ 2924.12, subd. (h); § 2924.19, subd. (h)).

At the heart of the HBOR are mandated procedures designed to promote good faith negotiation of some form of foreclosure alternative (§ 2923.4.), typically modification of the borrower's loan terms. Two provisions are most pertinent here. First, "When a borrower requests a foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact" (§ 2923.7, subd. (a)), a channel of

---

[6] Section 3281, which appears in Civil Code, division 4, part 1, title 2, chapter 1,article 1, sets forth a general definition of "damages." (§ 3281 ["Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."].)

communication referenced here in shorthand as a SPOC.[7]  The SPOC must remain assigned to the borrower's account until her application for a foreclosure prevention alternative is resolved or her loan is brought current (§ 2923.7, subd. (c)), and is responsible for ensuring that the borrower is considered for foreclosure alternatives offered by the servicer (§ 2923.7, subd. (b)(4)), informing the borrower of the process for applying for a modification and of relevant deadlines (§ 2923.7, subd. (b)(1)), and coordinating receipt of all of the borrower's application documents and of any missing elements of it (§ 2923.7, subd. (b)(2)).  The SPOC must have access to current information and personnel necessary to inform the borrower of the status of her application (§ 2923.7, subd. (b)(3)), and those personnel must include individuals empowered to stop the foreclosure process (§ 2923.7, subd. (b)(5)).  Failure to comply with the SPOC requirement is among the nine listed HBOR violations for which statutory remedies are available under sections 2924.12 and 2924.19.  (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 904.)

Second, the HBOR prohibits what is sometimes known as "dual tracking," a practice that, described broadly, occurs when a lender or servicer pursues foreclosure while simultaneously going through the motions of reviewing a borrower's application for foreclosure mitigation, without a good faith intent to entertain the application.  (*Jolley v. Chase Home Finance, LLC*, *supra*, 213 Cal.App.4th at p. 904 [" 'Mortgage lenders call it "dual tracking," but for homeowners struggling to avoid foreclosure, it might go by another name:  the double-cross.' "].)  While the SPOC requirement applies

---

[7] A SPOC may be a single individual or a "team of personnel each of whom has the ability and authority to perform" all of the SPOC's statutory responsibilities.  (§ 2923.7, subd. (e).)

just to the "mortgage servicer" (§ 2923.7), the "dual tracking" prohibition applies to any "mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent" (§ 2923.6, subd. (c)). In essence, it forbids the initiation and pursuit of a trustee's sale until a completed and still pending application of loan modification is fully resolved. (§ 2923.6, subds. (c)–(h).)[8] Where loan modification is denied, the bar on dual tracking prohibits the recording of a notice of default, the recording of a notice of sale, or the conduct of a sale, until the lender or servicer sends the borrower a written denial letter, giving reasons for the denial and advising the borrower she has 30 days to appeal. (§ 2923.6, subds. (c), (d), (f).) Along with failure to comply with the SPOC requirement, prohibited "dual tracking" is among the HBOR violations for which statutory remedies are available under sections 2924.12 and 2924.19. (*Valbuena v. Ocwen Loan Servicing, LLC*, *supra*, 237 Cal.App.4th at p. 1272.)[9]

There are some notable limitations built into the HBOR's foreclosure prevention scheme. From the standpoint of substantive rights and obligations, the HBOR does not confer upon borrowers any right to receive a loan modification or other loss mitigation option. (§ 2923.4; *Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1055–1056.) And

---

[8] A borrower's first lien loan modification application is deemed " 'complete' " when the borrower "has supplied the mortgage servicer with all the documents required by the mortgage servicer within the reasonable timeframes specified by the mortgage servicer." (§ 2924.10, subd. (b).)

[9] The SPOC and "dual tracking" statutes are both limited to large entities that handle a specified volume of annual foreclosures. (§§ 2923.6, subd. (i) ["Subdivisions (c) to (h), inclusive, shall not apply to entities described in subdivision (b) of Section 2924.18"], 2924.18, subd. (b) [describing certain entities who foreclosed on 175 or fewer residential properties in preceding year], 2923.7, subd. (f) [same limitation in SPOC provision for covered servicers].)

servicers have no obligation to review a successive loan modification application from a borrower who has already "been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of this section, unless there has been a material change in the borrower's financial circumstances since the date of the borrower's previous application and that change is documented by the borrower and submitted to the mortgage servicer." (§ 2923.6, subd. (g).) From the standpoint of remedies, consistent with a settled precept of nonjudicial foreclosure law prior to the HBOR's enactment, the HBOR's remedial scheme states that no violation of its provisions shall "affect the validity of a sale in favor of a bona fide purchaser." (§§ 2924.12, subd. (e), 2924.19, subd. (e).) It also limits liability—for injunctive relief prior to foreclosure, and for damages following foreclosure—to "material violation" of listed provisions. (§§ 2924.12, subds. (a) & (b), 2924.19, subds. (a) & (b).) And it further limits postforeclosure liability to claims for "actual economic damages pursuant to section 3281" resulting from violations that were "not corrected and remedied prior to the recordation of the trustee's deed upon sale." (§§ 2924.12, subd. (b), 2924.19, subd. (b); see *Billesbach v. Specialized Loan Servicing LLC* (2021) 63 Cal.App.5th 830, 837–838, 845 (*Billesbach*).)

## C. *The HBOR Claims: First Cause of Action (§ 2923.7) and Second Cause of Action (§ 2923.6) Against Chase and Rushmore*

### 1. The Borrower Exclusion

Section 2924.12, the statute authorizing a cause of action for violation of sections 2923.6 and 2923.7, applies only to a "borrower."[10] The definition of

---

[10] See section 2924.12, subdivision (a) ("a borrower may bring an action"); *id.*, subdivision (b) (". . . shall be liable to a borrower"); sections 2923.7, subdivision (a) ("When a borrower requests . . . ."), 2923.6,

a "borrower" under the HBOR excludes an individual who has filed for bankruptcy if "the bankruptcy court has not entered an order closing or dismissing the bankruptcy case, or granting relief from a stay of foreclosure." (§ 2920.5, subd. (c)(2)(C); see § 2920.5, subd. (c)(1).)

As the first of several alternative grounds for dismissing Morris's HBOR claims, the trial court ruled that, after two tries, Morris failed to allege with adequate clarity that she is a statutorily recognized "borrower" authorized to bring suit under section 2924.12. We disagree. Morris did not specifically allege she was a "borrower" within the meaning of the HBOR, but she did allege she borrowed money from the original lender, WaMu, using her home as security, and that at all relevant times she owned and lived in the house that was foreclosed upon as her primary residence. In Morris's initial complaint, she did not differentiate at all between the defendants, and she said very little about the precise timing of the various wrongful acts attributed to them. The question here is whether, as amended, her complaint adequately alleges that those acts took place while Morris was in active bankruptcy proceedings. The court ruled, essentially, that it could not tell, so it dismissed her HBOR claims. The length of both of Morris's complaints, the inclusion of extraneous facts, and the generality of her pleading style, hardly aided her cause, but upon careful study of the first amended complaint we do not think the timing of her bankruptcies is as impenetrably vague as the court's ruling would suggest.

Taking into account the chronology shown by judicially noticed bankruptcy pleadings, Morris's first bankruptcy ended in 2010, and her second bankruptcy ended in 2013, in each case well before the events

---

subdivision (c) ("If a borrower submits . . . ."); *id.*, subdivisions (d), (e) ("If the borrower's application . . . .").

underlying the alleged HBOR violations began in 2015. That makes Morris's third attempt to seek bankruptcy protection, filed on September 3, 2015, the only pertinent bankruptcy proceeding here. Morris alleges she "submitted a complete loan modification application sometime in early 2015." After that, she alleges, Chase proceeded to record a notice of default in April 2015, Chase recorded notices of foreclosure sale in August 2015 and September 2016, and Rushmore completed a foreclosure sale in April 2017, with all of these events occurring in the absence of a written denial of Morris's loan modification application explaining the reasons for the denial or giving her a right to appeal.

Chase and Rushmore make much of the fact that Morris admits she was advised verbally of a denial by Chase at some point, but that communication was insufficient to resolve her pending loan modification application. The denial of a loan modification, by itself, has no statutory significance. A denial must be in writing; it must include reasons; and it must advise the borrower of her right to appeal. (§ 2923.6, subds. (c)(1), (f).) No statutorily sufficient loan modification denial having been given—at any time—we conclude Morris fairly alleges (1) she had a completed loan modification application still pending with Chase when it initiated foreclosure proceedings in 2015 and resumed them in September 2016, and (2) her application remained pending when Rushmore carried out the foreclosure sale in April 2017. Because Chase's actions in initiating the foreclosure process in 2015 took place between Morris's second and third bankruptcies, and because Chase's resumption of the foreclosure process in September 2016 and Rushmore's conduct of the April 2017 sale took place after the stay was lifted on Morris's third bankruptcy, Morris adequately

21

alleges HBOR violations at times when she was a statutorily recognized "borrower."[11]

We grant that the above chronology is not obvious from the face of the first amended complaint. Chase and Rushmore correctly point out that, after the first demurrer was sustained without prejudice, Morris added nothing by way of amendment to clarify the timing of her bankruptcies relative to the alleged HBOR violations, despite the trial court's explicit observation in granting leave to amend that her initial complaint was "vague as to time with respect to most of [Morris's] HBOR violations." But because the full bankruptcy chronology was in the record (ironically, at the behest of the defendants), the pertinent chronological facts were before the court when the trial court decided the first and second demurrers, readily determinable from judicially noticed documents.

To the extent the court's decision to deny further leave to amend was influenced by Morris's failure to heed its admonition that she had only one chance to clarify the chronology by amendment, that too was error. Every general demurrer must be evaluated on its own merits with a view to whether the targeted pleading states a viable cause of action or causes of action, and to the extent it does not, the court must then decide whether there is a reasonable possibility that defects in the pleading can be cured. (See *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970–971 [" 'Where the complaint is defective, "[i]n the furtherance of justice great liberality

---

[11] To the extent Chase was exempt from HBOR liability from September 3, 2015, and the lifting of the bankruptcy stay on May 26, 2016—a period of approximately eight months during which the alleged HBOR violations continued—that presents an evidentiary issue the court can easily deal with by placing limitations on admissible proof or giving limiting instructions to a jury directing that nothing Chase did or failed to do in that period is to be taken as probative of an HBOR violation.

22

should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment." ' "].) The defendants point out it is appropriate to consider whether a plaintiff was given a fair opportunity to cure a previously identified pleading defect (*Careau & Co. v. Security Pacific Business Credit, Inc., supra*, 222 Cal.App.3d at p. 1387), but that presupposes there is a defect. Here, judicially noticeable facts that made the timing clear were before the court when it decided both demurrers.

Even were we to assume Morris's failure to better highlight facts that were already in the record was a pleading "defect," that would not justify the denial of leave to amend. While the burden is always on the pleader to demonstrate that there is a reasonable possibility she can overcome any pleading defects, the opportunity to cure by amendment is not governed by a "two strikes and you're out" rule or any other arbitrary limitation. At most, Morris's failure to improve her initial complaint by specifically cross-referencing judicially noticed facts was a defect of form subject to a special demurrer seeking clarification, but was not a fatal ambiguity. "When a complaint is good as against a general demurrer," as we now hold Morris's HBOR claims were—"it is erroneous for the trial court to sustain the demurrer without leave to amend because of defects in the form of pleading." (*Columbia Pictures Corp. v. DeToth* (1945) 26 Cal.2d 753, 762.)

## 2. Adequacy of SPOC Claim as Pleaded

Moving to the merits of Morris's HBOR causes of action, we start with the first cause of action for failure to appoint a SPOC. Under the language of section 2923.7 as the statute read when the conduct alleged in the operative amended complaint took place, "Upon request from a borrower who requests a foreclosure prevention alternative, the mortgage servicer shall promptly

23

establish a single point of contact and provide to the borrower one or more direct means of communication with the single point of contact." (Former § 2923.7, subd. (a); Stats. 2012, ch. 87, § 9.)

Both defendants deny they had any obligations to Morris under section 2923.7. They contend the allegations of the first amended complaint show that Morris was told verbally of the denial of her loan modification application in 2015; that Morris makes no allegation she submitted another loan modification application when Rushmore took over the loan servicing role in 2017; and that she does not allege she made a specific request for appointment of a SPOC from her new loan servicer, Rushmore. We have addressed and rejected the argument that Chase and Rushmore may claim an unexplained verbal denial in 2015 discharged their obligations to issue a "written determination" of Morris's loan modification application. (§ 2923.6, subd. (c)(1).) According to Morris's allegations, her completed application remained open and pending in 2017.

As for the argument that Morris fails to allege any specific request for appointment of a SPOC from Rushmore, that presents an issue of statutory interpretation. Under the "strict reading" of former section 2923.7 adopted in *Hatton v. Bank of America, N.A.* (E.D.Cal., July 8, 2015, No. 1: 15-cv-00187-GSA) 2015 WL 4112283, \*6, and other federal district court cases aligned with it,[12] Morris's failure to make an explicit request for a SPOC arguably

---

[12] *Jerviss v. Select Portfolio Servicing, Inc.* (E.D.Cal., Nov. 25, 2015, No. 2:15-CV-01904-MCE-KJN) 2015 WL 7572130, \*6; *Carbajal v. Wells Fargo Bank, N.A.* (C.D.Cal., April 10, 2015, No. CV 14-7851 PSG (PLAx)) 2015 WL 2454054, \*7.

There is an extensive body of decisions in federal court interpreting and applying the HBOR, where wrongful foreclosure cases have frequently been filed in recent years. Our Supreme Court has confirmed that federal

24

supplies an adequate basis for the trial court's ruling that her first cause of action fails to state a claim. Were we to adopt the holdings in these cases, that would dictate affirmance as a threshold matter on the SPOC claim, without any need for further analysis. (*Cal. Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1171 ["[W]e are not bound by the trial court's reasons; if correct upon any theory of applicable law, the [result below] must be affirmed."].)

But we do not find the *Hatton* line of cases to be persuasive. None of these cases engages with the statutory text and purpose in a meaningful way. We adopt instead the view stated by federal district courts that have held the phrase " 'upon request' simply indicates when the SPOC must be assigned (i.e., upon the borrower's request for a foreclosure prevention alternative, as opposed to the borrower's selection of a foreclosure prevention alternative)." (*Mungai v. Wells Fargo Bank* (N.D.Cal., June 3, 2014, No. C-14-00289 DMR) 2014 WL 2508090, *9, italics omitted.) "[T]o the degree that the statute is ambiguous," the contrary reading in the *Hatton* line of cases "runs against the general canon that a statute should not be read to defeat itself. To read the statute as requiring an explicit request would at best place an unnecessary technical burden on borrowers and at worst defeat the intent of the statute altogether: most borrowers are unlikely to be aware of the language of § 2923.7 and are therefore unlikely to demand their right to a single point of contact." (*Mora v. US Bank* (C.D.Cal., July 27, 2015, No. CV 15-02436 DDP (AJWx)) 2015 U.S.Dist.Lexis 97731, *14–*15, fn. 1.)

We find it noteworthy that the language of former section 2923.7 was slightly revised, effective January 1, 2019, to delete the phrase, "Upon

---

authority may be considered for its persuasive value in applying California nonjudicial foreclosure law. (*Yvanova*, *supra*, 62 Cal.4th at p. 936, fn. 11.)

request from a borrower who requests . . ." and replaced with, "When a borrower requests . . ." as the opening phrase of the statute, making it clear the duty to appoint a SPOC arises whenever the borrower requests a foreclosure prevention alternative, and that clarification must be taken into account. The 2019 amendment, to be sure, "postdated the [events alleged] . . . in this matter and therefore cannot, of [its] own force," resolve the ambiguity, since the interpretation of the intent of a past Legislature in enacting a prior statute is solely within the judicial province. (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1099.) But we must nonetheless "give due consideration to the Legislature's stated views on 'the prior import of its statutes.' " (*Ibid.*) To the extent the statute's use of the word "request" twice in the opening clause of the section creates an ambiguity in the language of section 2923.7 as it stood from 2013–2018, we conclude that the Legislature's 2019 clarification tips the scale in favor of the *Mungai* line of cases.

Having determined, then, that Chase and Rushmore had the obligation to appoint a SPOC once Morris requested a foreclosure prevention alternative "sometime in early 2015," the question is whether they violated that obligation on the facts alleged. We conclude that each of them did. Morris alleges that Chase "failed to promptly establish a single point of contact" for her account when she submitted her loan modification request. She further alleges that, during the time she was dealing with Chase in 2015, she was "shuffled from one representative to another every time she called asking for assistance and what she need[ed] to do. Each representative kept asking [for] the same information and the same documents [Morris] previously submitted with no progress in the status of [her] request for assistance." These representatives "kept providing [Morris] with positive statements and

26

reassurances that [she] would obtain a loan modification," even though, without telling her the foreclosure process had started, and without giving her the statutorily required written notice of denial of her loan modification application, Chase had recorded a notice of default and a notice of trustee's sale, thereby rendering the assurances she was given false by omission.

Then, when Rushmore took over the loan servicing role for Chase in 2017, there was a replay of the same events, with Rushmore giving Morris the "runaround," and failing to appoint a SPOC for her account, just as Chase had done before it. Morris alleges she was consistently told she needed to speak to "Vivian," but was unable to make contact with any such person, and never received a return phone call from anyone by that name, before Rushmore sold the home in foreclosure without any notice to Morris. She alleges Vivian, whoever she was, did not have the competence to serve in the role described in the SPOC statute, and that Rushmore's appointment of an unqualified SPOC violated the HBOR. (§ 2923.7, subd. (e).) She also alleges she was given inconsistent and inaccurate information by Rushmore representatives.

These allegations adequately state a violation of section 2923.7 for failure to appoint a SPOC through which Morris could obtain reliable, up-to-date information about any impending foreclosure. If Morris did not qualify for an offer to adjust her loan terms, she deserved to know that was the case before the foreclosure process began so she could, if possible, address the reasons for denying her modification terms, and if necessary, make a final effort to persuade Chase to change its mind in the four weeks before the trustee's sale. But she was not given that chance. In essence, her theory is that, by failing to appoint a competent and knowledgeable SPOC, Chase and then Rushmore put up a stonewall, refused to advise her of the status of her

modification application, denied her an opportunity to address the reasons for their refusal to offer modified loan terms, and deprived her of the right to appeal. That is enough to survive a demurrer on a section 2923.7 claim.

The trial court's ruling to the contrary rests on the premise that a plaintiff seeking postforeclosure damages under the HBOR must allege what it termed "material 'actual economic damages.' " It then reasons that Morris's "conclusory allegation that she 'suffered damages in an amount not presently ascertained [that] will be proved at trial' is insufficient" to meet this requirement. The terminology the court uses to frame the issue to be decided—"material 'actual economic damages' "—highlights the error here. The operative statutory language provides that after a trustee's sale, a qualifying defendant "shall be liable to a borrower for *actual economic damages* pursuant to Section 3281, *resulting from* a *material violation* of Section 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17. . . ." (§ 2924.12, subd. (b), italics added.) In this statutory formulation, the words "actual economic" modify "damages," and the word "material" modifies "violation." By rearranging the order of the words and truncating them into a single merged phrase, the trial court conflates the "materiality" and "actual economic damages" requirements, and overlooks the independent significance of the "resulting from" requirement. These components of the statutory language are related, but they are distinct and should be analyzed separately.

Correct application of the statutory language requires a three-step analysis. The first step is to evaluate whether the plaintiff alleges "actual economic damages." If there are no "actual economic damages," there is no need to go further. The claim fails. Although wholly conclusory allegations of damages to be proved at trial will not suffice, the burden to plead "actual

28

economic damages" is not an onerous one. All Morris had to allege was that she "suffer[ed] detriment from the unlawful act or omission of another" (§ 3281) on facts allowing a reasonable inference that the detriment was "economic" in nature.[13] We read the first cause of action to meet this test. Morris alleges she incurred expenses in an effort to prevent foreclosure before her loan modification application was properly resolved. She claims she "hired" an agent to help her pursue loan modification. It may be reasonably inferred she incurred some expense for that. She also alleges, as confirmed by judicially noticed pleadings, that she filed a lawsuit against Rushmore and Chase—later withdrawn after she learned that her home had been sold—in which she attempted to secure an order requiring compliance with the HBOR. That, too, would presumably have required her to incur expenses. In addition, Morris amended her complaint to add specific allegations that she spent significant amounts of money improving her home and that those improvements increased its value. From that, a reasonable inference may be drawn that, in suffering foreclosure—which she alleges was avoidable, and for pleading purposes we must accept that as true—she lost equity in her home. There may well be a variety of other forms of financial injury that Morris can prove up at trial, but for pleading purposes these two categories of economic harm are sufficient.

---

[13] While normally plaintiffs suing for breach of "an obligation not arising from contract" (§ 3333) may claim "damages" (§ 3281) for "harm suffered in person *or* property" (§ 3282, italics added)—hence the recoverability of emotional distress damages and other forms of noneconomic damages—and even in the absence of actual loss may seek nominal damages (§ 3360), the Legislature has chosen to limit monetary recovery under the HBOR to "actual economic damages." (§§ 2924.12, subd. (b), 2924.19, subd. (b).)

Second, we consider whether the first cause of action alleges damages "resulting from" the wrong Morris alleges. Because the statutory phrase "resulting from" calls for what is, in effect, a causation analysis, we must bear in mind that causation is generally viewed as a question of fact. (*Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 792–793.) Mindful of that basic principle, we believe Morris's SPOC claim easily meets the "resulting from" element of section 2924.12, subdivision (b)(1). She alleges that, "[H]ad Defendants properly reviewed [her] loan modification and loss mitigation requests in a timely manner" rather than giving her the "runaround," "[she] would have either been approved for a loan modification, or would have pursued other foreclosure alternatives . . . ." She further alleges that, "Had [Chase and Rushmore] helped [p]laintiff when she first called, [p]laintiff's home would not have been foreclosed on because she qualifies for, and is entitled to, foreclosure alternatives." Chase and Rushmore may disagree with these allegations (though they have never said so directly or explained why she did not qualify), but that is irrelevant as a pleading matter. While Morris's extensive history of declared insolvencies suggests what they might say, she has alleged enough to advance to the discovery process and see this issue decided at trial or on summary judgment.

Third, we consider whether Morris alleges a "material violation" of section 2923.7. "A material violation is one that affected the borrower's loan obligations, disrupted the borrower's loan modification process, or otherwise harmed the borrower." (*Billesbach*, *supra*, 63 Cal.App.5th at p. 837.)[14]

---

[14] *Billesbach* adopted its definition of "material" from *Cardenas v. Caliber Home Loans, Inc.* (N.D.Cal. 2017) 281 F.Supp.3d 862. (*Billesbach*, *supra*, 63 Cal.App.5th at p. 845.) Chase and Rushmore argue that the

Ultimately, at this stage of the analysis, we ask whether the alleged violation undermined the overall purpose of the HBOR. (*Billesbach*, at p. 846 ["the HBOR creates no liability for a technical violation that does not thwart its purposes"].) In doing so, we need not recharacterize the purpose of the HBOR because the Legislature has stated it plainly: "The purpose of the act that added this section is to ensure that, as part of the nonjudicial foreclosure process, borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options, if any, offered by or through the borrower's mortgage servicer, such as loan modifications or other alternatives to foreclosure." (§ 2923.4.)

On this record, can it be said as a matter of law—taking to be true what Morris has alleged—that Chase and Rushmore made a substantial

---

*Cardenas* definition "makes sense" and urge us to adopt it as well, which we do, but with two cautionary observations. First, we read the "otherwise harmed the borrower" prong of this test to mean harm to the borrower in her efforts to be considered for a loss mitigation option (§ 2923.4). Read more broadly to encompass damages, that aspect of the test invites conflation of the actual economic damages and materiality elements of sections 2924.12, subdivision (b), and 2924.19, subdivision (b). Second, *Cardenas* applied this test under the facial plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, for motions to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure. (*Cardenas*, *supra*, 281 F.Supp.3d at p. 867.) It should not be assumed that the standards governing motions to dismiss in federal court and demurrers in state court are the same. (Cf. *Yvanova*, *supra*, 62 Cal.4th at p. 936, fn. 11) [while federal authority may be considered for its persuasive value in applying the doctrine of standing in wrongful foreclosure cases, it should not be assumed that standing means the same thing in state and federal court].) In drawing from federal HBOR authority on the issue of materiality, trial courts should be cognizant that federal district judges have more latitude to dismiss claims at the pleading stage under *Bell Atlantic Corp. v. Twombly* than California trial judges have under our traditional notice pleading standards. That was not an issue in *Billesbach*, which was a summary judgment case.

31

enough effort to comply with section 2923.7 to justify the conclusion that Morris was "considered for, and [had] a meaningful opportunity to obtain, . . . available loss mitigation options"?  (§ 2923.4.)  We think not.  The SPOC statute requires not just that loan servicers provide borrowers seeking loss mitigation options a single source of information, but to qualify as a SPOC within the meaning of section 2923.7, the person or team in that role must have the "ability and authority to perform the responsibilities" set forth in seven areas of competence.  (§ 2923.7, subds. (b)–(e).)  According to Morris, Chase assigned no SPOC to communicate with her; Rushmore assigned someone named "Vivian" who was unreachable; and neither Chase nor Rushmore met any of the numerous SPOC competence criteria.  As a result, Morris alleges, she was never meaningfully considered for a foreclosure prevention alternative.

All Chase and Rushmore say in response is that Morris was verbally informed of the denial of her loan modification application, that under the HBOR she had no guaranteed right to the modification she requested, and that at most what she complains of is a "technical" violation of the HBOR.  Given the alleged wholesale failure to comply with section 2923.7 in any respect, nothing about the claimed violations here may be fairly characterized as "technical."  The import of the materiality defense advanced by Chase and Rushmore is that any violation of section 2923.7, even total noncompliance with it, is "technical," which would render the SPOC statute effectively unenforceable.  We reject this argument.  (*Salazar v. U.S. Bank, N.A.* (C.D.Cal., Apr. 6, 2015, No. ED CV 14-514-GHK (DTBx)) 2015 U.S.Dist.Lexis 49172, *1 [acceptance of servicer's argument that there was no material violation of § 2923.7 in a case where no SPOC was appointed would " 'render the SPOC requirement a nullity' "].)  By forcing Morris to deal

32

with multiple people, none of whom could inform her of the status of her application; by giving her inconsistent and inaccurate information; and by stringing her along until her home was sold without notice, she alleges that Chase and then Rushmore deprived her of a meaningful opportunity to be considered for a loan modification. That, in our view, states a material violation of section 2923.7.

### 3. Dual Tracking

#### a. *Abatement*

Chase and Rushmore contend Morris has not alleged a viable cause of action under section 2923.6, subdivisions (c) through (f), because those sections were repealed effective January 1, 2018. We conclude, to the contrary, that her section 2923.6 cause of action survived this repeal.

Some further background on the legislative history is necessary here. The Legislature that enacted the HBOR in 2012 accomplished the repeal via a self-executing "sunset" clause that allowed certain of the homeowner protections to lapse after five years, while simultaneously putting into effect replacement language for some of those protections as of the "sunset" date, January 1, 2018. (Stats. 2012, ch. 86, §§ 7 & 8; Stats. 2012, ch. 87, §§ 7 & 8.) The dual tracking prohibition was one of the provisions the Legislature replaced, albeit in revised and renumbered form. The 2018 dual tracking prohibition was moved to former section 2924.11, subdivisions (a)–(b), and (f) (Stats. 2012, ch. 86, § 15), where it retained most of the original provisions of section 2923.6 as originally enacted in 2012, but deleted the subdivisions giving loan modification applicants a 30-day period to appeal denials and a right to file more than one loan modification application upon a showing of changed financial circumstances. Essentially, what the Legislature did as of January 1, 2018 was split section 2923.6 into two pieces, leaving some general statements of legislative intent in subdivisions (a) and (b) (former

33

section 2923.6; Stats. 2012, ch. 87, § 8), while shifting the substance of the dual tracking prohibition to former section 2924.11 in slightly revised form (former § 2924.11, subds. (a)–(b), (f); Stats. 2012, ch. 86, § 15).

Echoing the trial judge's reasoning, Chase and Rushmore now argue that, because of the repeal of section 2923.6 at year's end 2017, Morris's dual tracking claim was abated. For the general principle of abatement, they rely on *Rankin v. Longs Drug Stores California, Inc.* (2009) 169 Cal.App.4th 1246, 1256, and *Beverly Hilton Hotel v. Workers' Comp. Appeals Bd.* (2009) 176 Cal.App.4th 1597, 1602,1611. Under the holdings in these cases, Chase and Rushmore argue, Morris's dual tracking claim abated effective January 1, 2018, since all section 2923.6 did as of that date was "express[] . . . the Legislature's finding that a loan modification sometimes may be in the best interest of all parties, and that a loan modification is encouraged when consistent with a mortgage servicer's contractual authority." Chase and Rushmore point to two federal district court cases, *Jacobik v. Wells Fargo Bank, N.A.* (N.D.Cal., Mar. 7, 2018, No. 17-cv-05121-LB) 2018 U.S.Dist.Lexis 37589, and *Haynish v. Bank of America, N.A.* (N.D.Cal., May 31, 2018, No. 17-cv-01011-HRL) 2018 U.S.Dist.Lexis 91274, both of which hold specifically that pre-2018 dual tracking claims were abated as result of the repeal-and-replace scheme in section 2923.6 as originally enacted in 2012.

This argument is flawed on a number of levels. The trial court—ruling on the demurrers at issue here in June 2018, the same year *Jacobik* and *Haynish* were decided—premised its abatement analysis on the observation that the version of section 2923.6, effective January 1, 2018, did "not contain dual tracking prohibitions" and that the HBOR enforcement scheme no longer provides a remedy for this section. Chase and Rushmore implicitly suggest the same thing, contending that the dual tracking ban was diluted

34

into little more than a statement of aspiration as of January 1, 2018. What this line of argument overlooks is that in 2018 the Legislature moved the dual tracking prohibition to former section 2924.11 and restated it, retaining the ban on dual tracking as narrowed in some respects but continuing it in force. Thus it is inaccurate to suggest that, as of 2018, the HBOR no longer prohibited dual tracking (which is what the trial court implies in stating that former section 2923.6 dropped the prohibition) or was replaced with, in effect, a statutory "best efforts" clause (which is what Chase and Rushmore argue, without taking into account former section 2924.11). The dual tracking prohibition was simply moved to another code section at that point, and most of its provisions were retained.

*Jacobik* and *Haynish* recognize this subtlety, and as a result, they focus on whether former section 2924.11, subdivisions (a)–(f), the 2018 successor statute to the original version of section 2923.6, subdivisions (c)–(h), constituted a substantially similar continuation of the original dual tracking ban and therefore should be taken as evidence of a legislative intent to "save" dual tracking claims that arose in the years 2013–2017. (See *Governing Board v. Mann* (1977) 18 Cal.3d 819, 829 ["when a pending action rests solely on a statutory basis, and when no rights have vested under the statute, 'a repeal of [the] statute without a saving clause will terminate all pending actions based thereon' "].) They reject the argument that it was, but there is a split in the federal authority on this point, with some federal courts— including the Ninth Circuit, in an unpublished memorandum opinion— holding to the contrary. (*Travis v. Nationstar Mortgage, LLC* (9th Cir. 2018)

35

733 Fed.Appx. 371, 376.)[15] *Travis*, which was also decided in 2018, applies the principle that " 'when a statute is repealed without a saving clause and as a part of the same act it is simultaneously re-enacted in substantially the same form and substance, all rights and liabilities which accrued under the former act will be preserved and enforced.' " (*Travis*, at p. 373, citing *Chambers v. Davis* (1933) 131 Cal.App. 500, 506.) A number of cases part ways with *Jacobik* and *Haynish* and follow *Travis* instead.[16]

The *Travis* line of cases has it right. *Jacobik* and *Haynish*, the cases Chase and Rushmore rely upon here for the specific application of the abatement doctrine they propose, were decided during a brief moment in time when the operative dual tracking prohibition in the HBOR was arguably narrower in some procedural respects than the original version enacted in 2012. But effective January 1, 2019, that was no longer the case. Less than a year after the original HBOR "sunset" date on January 1, 2018, the Legislature reenacted section 2923.6 in a form that tracks the original 2012 version of section 2923.6 nearly word-for-word, in substance merely deleting subdivision (g), the original "sunset" clause, and thus making section 2923.6—as originally passed in 2012—permanent. (§ 2923.6, subd. (c); Stats. 2018, ch. 404 (Senate Bill No. 818), § 7, eff. Jan. 1, 2019.) Netting everything

_____

[15] See *Huml v. Servis One, Inc.* (C.D.Cal., July 22, 2021, No. SA CV 20-00489-DOC-KES) 2021 WL 4805452, *3 (relying on *Travis*); *Chin King Wong v. Wells Fargo Bank, N.A.* (E.D.Cal., Nov. 30, 2020, No. 2:18-cv-02811-TLN-CKD) 2020 WL 7024234, *7 (same).

[16] See *Sobey v. Molony* (1940) 40 Cal.App.2d 381, 385 ("When a statute, although new in form, re-enacts an older statute without substantial change, even though it repeals the older statute, the new statute is but a continuation of the old. There is no break in the continuous operation of the old statute, and no abatement of any of the legal consequences of acts done under the old statute.").

out, what we have here is not literally simultaneous reenactment (*Chambers v. Davis, supra*, 131 Cal.App. at p. 506; *Cort v. Steen* (1950) 36 Cal.2d 437, 440), but is equivalent to it.

Moreover, to remove all doubt, accompanying the reenactment bill in 2018 was the following uncodified statement of legislative intent: "It is the intent of the Legislature that any amendment, addition, or repeal of a section or part of a section enacted by Senate Bill 900 (chapter 87 of the Statutes of 2012) and Assembly Bill 278 (chapter 86 of the Statutes of 2012), commonly known as the California Homeowner Bill of Rights, that took effect as of January 1, 2018, shall not have the effect to release, extinguish, or change, in whole or in part, any liability that shall have been incurred under that section, or part of a section, prior to January 1, 2018, unless the amendment, addition, or repeal expressly so provides. The section, or part of a section, that was amended, added, or repealed shall be treated as still remaining in force for the purpose of sustaining any proper action, suit, or proceeding for the enforcement of such a liability, as well as for the purpose of sustaining any judgment, decree, or order." (Stats. 2018, ch. 404, § 26.)

The trial court cannot be faulted for not predicting what was to come only a few months after it ruled in June 2018, but the restoration of section 2923.6 to its original form as of January 1, 2019, and the clear statement of intent accompanying that legislation buttress our conclusion that the *Travis* court's analysis is correct. We conclude it was not the 2012 Legislature's intent to eliminate the dual tracking prohibition and permanently replace it with a more permissive law that retroactively permitted the conduct alleged to have taken place in this case. Rather, as we read the original statutory scheme, the intent was to put the HBOR into effect on a temporary basis for five years, along with a framework that would remain in place if nothing else

37

was passed to replace it, while leaving to a subsequent Legislature the determination whether the original HBOR scheme in its entirety should become permanent. When the 2018 Legislature chose permanency, its uncodified expression of intent that "liability" accruing prior to January 1, 2018, would not be "release[d], extinguish[ed], or change[d]" in an action for the "enforcement of such a liability" (Stats. 2018, ch. 404, § 26) does not bind us, but as we noted above in our discussion of a slight change to the language of section 2923.7 in 2019 (see *ante*, at pp. 25–26), we must "give due consideration to the Legislature's stated views on 'the prior import of its statutes.' " (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.*, *supra*, 101 Cal.App.4th at p. 1099.) Morris seeks to enforce—and we are here applying—a dual tracking prohibition that was operative at the time of the events she alleges, which means Chase and Rushmore are in no position to argue they lacked notice of the legal standards governing their conduct. To apply the abatement doctrine in these circumstances would give them an undeserved reprieve from the consequences of alleged conduct that was illegal at the time they are charged with engaging in it, and that remains illegal today.[17]

    b. *Adequacy of Dual Tracking Claim as Pleaded*

Section 2923.6, subdivision (c), provides, "If a borrower submits a complete application for a first lien loan modification offered by, or through,

---

[17] This is not a case in which the conduct allegedly violative of section 2923.6 took place during the brief interregnum period in 2018 when former section 2924.11, subdivision (a), was in force. Because the question is not presented here, we do not address whether the abatement principle that governs in a situation where "the Legislature enacts a statute that completely reverses substantive law by effectively permitting previously prohibited conduct" (*Rankin v. Longs Drug Stores California, Inc.*, *supra*, 169 Cal.App.4th at p. 1253) might apply on such facts, in the absence of an express saving clause in the repealing legislation.

the borrower's mortgage servicer at least five business days before a scheduled foreclosure sale, a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale, or conduct a trustee's sale, while the complete first lien loan modification application is pending." Section 2923.6, subdivisions (c)–(d) further provides, "A mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale until any of the following occurs: [¶] (1) The mortgage servicer makes a written determination that the borrower is not eligible for a first lien loan modification, and any appeal period pursuant to subdivision (d) has expired. [¶] (2) The borrower does not accept an offered first lien loan modification within 14 days of the offer. [¶] (3) The borrower accepts a written first lien loan modification, but defaults on, or otherwise breaches the borrower's obligations under, the first lien loan modification. [¶] (d) If the borrower's application for a first lien loan modification is denied, the borrower shall have at least 30 days from the date of the written denial to appeal the denial and to provide evidence that the mortgage servicer's determination was in error."

Morris alleges that she submitted a completed loan modification application more than five days before the scheduled trustee's sale in April 2017; that she never received a written denial of her application; that a trustee's sale was conducted in the absence of a "written determination that [she was] not eligible for a first lien loan modification" (§ 2923.6, subd. (c)(1)); and that she was not given "at least 30 days from the date of the written denial to appeal the denial and to provide evidence that the mortgage servicer's determination was in error" (*id.*, subd. (d)). Based on those allegations, Morris adequately states a violation of section 2923.6 against

both Chase and Rushmore.  (Cf. *Berman v. HSBC Bank USA, N.A.* (2017) 11 Cal.App.5th 465, 472 [lender materially violated HBOR by sending borrower letter affording him shorter time than required by statute to appeal initial denial of loan modification, which "effectively diminished" borrower's right to appeal].)

Chase attempts to argue that, because it was no longer a "mortgage servicer" as of April 2017, it may not be held liable for a sale conducted without proper handling of Morris's loan modification application.  This argument is disingenuous.  Putting aside the fact that at least three of the prohibited acts, recording a notice of default and recording two notices of trustee's sale, took place either prior to Morris's 2015 bankruptcy filing or after the lifting of the bankruptcy stay in 2016, at times when Chase was still her loan servicer, the argument rests on a misleading quotation from the language of section 2924.12, subdivision (b).  According to Chase, "After a trustee's deed upon sale is recorded, a mortgage servicer . . . shall be liable to a borrower for actual economic damages . . . resulting from a material violation of Section . . . 2923.6, 2923.7 . . . *by that mortgage servicer . . . .*" (§ 2924.12, subd. (b), italics added by Chase.)  But the ellipses in this quotation elides the full statutory description of the entities who shall be liable for a loan servicer's violation of sections 2923.6 or 2923.7.  Fully and correctly quoted, the relevant language in section 2924.12, subdivision (b) provides that "*a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent*" (italics added) shall be liable for the servicer's violation. Chase may not have been the servicer when the trustee's sale took place, but according to the facts which it put into the record by request for judicial notice, in April 2017 it stood in the shoes of the original lender by assignment as the mortgagee and beneficiary.

40

Which brings us once again to materiality. The trial court ruled that, "As a separate and independent ground for sustaining the demurrer, . . . Plaintiff has not alleged a material violation of . . . [section] 2923.6." We disagree. Section 2923.6 is all about timing. Neither a notice of default nor a notice scheduling a trustee's sale may be recorded, nor may a trustee's sale be conducted, *until* the loan servicer provides written denial of a pending loan modification application, and the conduct of the sale may not take place *until* the 30-day period that modification applicants have to appeal such a denial has expired. On the facts alleged here, Morris submitted a completed modification application "sometime in early 2015," and, without issuing a written denial of her application, Chase recorded a notice of default in April 2015, a first notice of trustee's sale in August 2015, and a second notice of trustee's sale in September 2016. And with Morris's loan modification still pending in 2017, Rushmore proceeded with a trustee's sale in April 2017.

Faced with these allegations, Chase and Rushmore do not claim that the timing scheme of section 2923.6 was met in any respect. Rather, they reprise the same lack of materiality argument they make with respect to section 2923.7. They argue that section 2923.6 does not apply because, based on the verbal denial of Morris's loan modification application, she had no pending modification application when Rushmore took over the foreclosure process in 2017. At most, Chase and Rushmore contend, Morris complains of "technical" violations of the dual tracking statute. According to them, she was not entitled to a modification and therefore could not have been harmed. The trial court's analysis is essentially the same. "Notwithstanding her opportunity to amend," it points out, "Plaintiff has failed to allege that any technical violations of the dual tracking provisions were 'material,' in the sense that but for those violations, Defendants would have agreed to a loan

modification agreement [on terms she] could have afforded." Here again, the trial court conflates the issue of materiality with whether Morris can, in fact, prove that Chase and Rushmore caused her alleged damages. To the extent Chase and Rushmore deny that Morris can prove causation because, as the court put it, their conduct was not the "but for" cause of her failed effort to secure a loan modification, that is an issue of fact and may not be resolved on demurrer.

We reject the claim that failure to issue a written denial stating reasons was only a "technical" violation of section 2923.6. The written denial and statement of reasons requirements not only ensure a modification applicant has the opportunity to respond to the specific grounds for the denial, thus promoting dialogue, but also provide evidence that the modification application was actually reviewed and taken seriously. The absence of a written denial with stated reasons prevented Morris from responding in an informed way to concerns raised about deficiencies in her application, or from mounting an effective appeal. We conclude, therefore, that what Chase allegedly did, and what Rushmore allegedly did when it assumed the servicer role in 2017, "effectively diminished" Morris's right to appeal (*Berman v. HSBC Bank USA, N.A.*, *supra*, 11 Cal.App.5th 465, 472), and "disrupted the loan modification process" (*Billesbach*, *supra*, 63 Cal.App.5th at p. 837). On this record, we cannot say as a matter of law that Chase and Rushmore did enough to comply with section 2923.6 to justify the conclusion that she "was considered for, and [had] a meaningful opportunity to obtain[] available loss mitigation options." (§ 2923.4.)

Compare the allegations here to what happened in *Billesbach*, where a loan servicer initiated a foreclosure process without responding to a pending loan modification application, but when the borrower obtained an injunction

against the sale, the servicer took steps to cure the violation. The appellate panel found that after the borrower successfully obtained an injunction blocking the initial foreclosure sale, the servicer postponed "the . . . sale, provided appellant with a single point of contact, communicated with him about foreclosure alternatives, reviewed his loan modification application, and ultimately offered him a trial-period modification plan." (*Billesbach, supra*, 63 Cal.App.5th at p. 846.) "These curative measures," the panel held, "satisfied the HBOR's purpose to ensure that borrowers have a meaningful opportunity to obtain loss-mitigation options." (*Ibid*.) In the panel's view, the fact that the servicer began communicating with the borrower only after it recorded a notice of default and scheduled the date for the trustee's sale was only a "technical" violation, cured by its subsequent, active efforts to engage with the borrower in the loan modification process. (*Ibid*.) Suffice it to say that, at this stage, on the pleaded allegations before us—*Billesbach*, as noted above, was a summary judgment case (see *ante*, fn. 14)—we see no similar efforts by Chase or by Rushmore to ensure that Morris was "considered for, and [had] a meaningful opportunity to obtain, available loss mitigation options." (§ 2923.4.) Whether Morris can prove she would have qualified for some form of loan foreclosure alternative and thus, in fact, was harmed by the alleged violations of section 2923.6 are questions of causation and damages, as we have explained above.

D. *Third Cause of Action (§ 2924b) Against Chase*

The trial court ruled Morris's section 2924b cause of action was subject to demurrer because the amended complaint does not allege a violation by any particular defendant. We disagree.

On appeal, Chase contends the trial court's reasoning was correct and pursues several additional arguments as well. First, reiterating the trial court's rationale, Chase argues that Morris's third cause of action remains

43

deficient because "the amended complaint, like the original complaint, vaguely allege[s]" in the passive tense "that Morris was not 'served' with a copy of the Notice of Default by registered or certified mail and purportedly only discovered that the Property was sold after the foreclosure sale." Chase argues that "[d]espite the deficiency having been identified, Morris did not bother to amend her allegations on this point when the trial court allowed an amendment." This is incorrect. The first amended complaint narrows the section 2924b violation by alleging it solely against Chase. That sufficiently identifies Chase as the target of the claim and hence the alleged violator of section 2924b.

Second, Chase argues that "the purported § 2924b violation caused [no] prejudice to Morris." Chase bases this argument on the principle that a nonjudicial foreclosure sale is afforded a common law presumption that it was " 'conducted regularly and fairly' " (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1258), a presumption it correctly states may be rebutted only by "substantial evidence of prejudicial procedural irregularity" (*ibid*.). According to Chase, Morris fails to overcome that presumption because she had actual notice of the initially scheduled trustee's sale on September 10, 2015. As shown by Morris's bankruptcy filing on September 3, 2015, within days of the sale, Chase argues, she knew of the trustee's sale and therefore could not have been prejudiced by any failure to mail her notice of it.

That is certainly one reasonable inference to be drawn from the timing of Morris's bankruptcy filing, but it is not the only inference. It may be, for example, that she had no idea a default had been declared or that a trustee's sale was imminent, but rather, that having heard nothing from Chase in response to her loan modification application in early 2015, she filed for

44

bankruptcy in an attempt to forestall what Chase might do in light of its dilatory handling of her application—initiate foreclosure without notice—not what she had actual notice it was already doing. The timing of Morris's eventually withdrawn lawsuit, filed in late April 2017 the day before the April 27, 2017 trustee's sale, raises a similar issue—since that, too, suggests she had actual notice of an impending sale—but there we see a factual issue as well. That too could have been preemptive. What counts for pleading purposes is that Morris alleges she heard for the first time about the trustee's sale after the sale had been conducted. On demurrer, we must accept that allegation. It is not necessarily refuted by pleaded or judicially noticed facts.

Chase next argues that section 2924b is not a listed statute in the HBOR enforcement scheme and therefore confers no private cause of action. It is true that, under the HBOR, a private action for damages may only be brought based on "a material violation of the statutory provisions that the Legislature has chosen to list [in sections 2924.12 and 2924.19], but not due to a violation of unlisted provisions." (*Lucioni v. Bank of America, N.A.*, *supra*, 3 Cal.App.5th at p. 159; see *Cornejo v. Ocwen Loan Servicing, LLC* (E.D.Cal. 2015) 151 F.Supp.3d 1102, 1117–1118 [§ 2924, subd. (a)(5) not actionable because not listed in § 2924.12].) But section 2924b is not part of the HBOR. It has been in the Civil Code since 1933. Private rights of action for faulty notice have been prosecuted under it for decades. (See *I. E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 284–289; *Smith v. Williams* (1961) 55 Cal.2d 617, 620–621.) The statute requires a mortgagee or trustee to send a copy of a notice of default to the mortgagor at his or her last known address by registered or certified mail within 10 business days after it is recorded, and a copy of a notice of trustee's sale at least 20 days before the scheduled sale date. (§ 2924b, subd. (b)(1) & (2).) Since section

45

2924b is not part of the HBOR, cases holding that there is no private right of action for damages other than those specifically listed in sections 2924.12 and 2924.19 do not apply.

Wholly apart from the HBOR, Chase insists that "the only remedy for a violation of [section] 2924b is a postponement of the foreclosure sale." Chase here suggests that, even if Morris has the ability to enforce section 2924b privately, the statute does not authorize the damages relief she seeks. The only authority cited for this proposition is *Bennett v. Wells Fargo, N.A.* (N.D.Cal., Aug. 9, 2013, No. CV 13-01693-KAW) 2013 U.S.Dist.Lexis 112756, *17, a federal district court opinion that in turn cites only section 2924g[18] in support of its narrow reading of the available remedies for violation of § 2924b, with no further explanation. (*Bennett*, at p. *15.) But section 2924g—which governs the time, place and manner of sale and specifically contemplates that the sale date announced in a notice of trustee's sale may be postponed by court order (§ 2924g, subd. (c)(1)(A); see *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 214, 223–225, 235—does not address the subject of remedies for violation of section 2924b.

We do not find *Bennett* to be persuasive on this point. Section 2924b is one of a number of statutes governing presale notice of nonjudicial foreclosure. A postforeclosure private action for damages has been recognized for more than 50 years when a lender conducts a trustee's sale without

---

[18] "The notice of each postponement and the reason therefor shall be given by public declaration by the trustee at the time and place last appointed for sale. A public declaration of postponement shall also set forth the new date, time, and place of sale and the place of sale shall be the same place as originally fixed by the trustee for the sale. No other notice of postponement need be given." (§ 2924g, subd. (d); but see § 2924, subd. (a)(5) [written notice required for any postponement longer than 10 business days].)

abiding by the statutory formalities governing foreclosure sales.  (See *Munger v. Moore*, *supra*, 11 Cal.App.3d at pp. 5–8 [deprivation of right to cure under § 2924c].)  Once such a sale is complete, a presumption of regularity will generally prevent any attack on title held by a bona fide purchaser.  Thus, it has been held, "Where the trustor is precluded from suing to set aside the foreclosure sale, the trustor may recover damages from the trustee" for conducting the sale in violation of section 2924b.  (*Moeller*, *supra*, 25 Cal.App.4th at p. 832, citing *Munger v. Moore*, *supra*, at pp. 9, 11.)  Absent the rare circumstance that equity is available to void the sale for fraud, a trustor who has suffered a violation of section 2924b has no other remedy, since it is impossible to seek postponement of an unknown event.

The HBOR contains a broad saving clause preserving preexisting remedies.  (§ 2924.12, subd. (g) ["Nothing in this section shall be construed to alter, limit, or negate any other rights, remedies, or procedures provided by law."].)  The cases allowing postforeclosure damages claims for violation of section 2924b are part of the fabric of common law remedies for procedural irregularity in nonjudicial foreclosure that predated the HBOR.  We therefore conclude that, when the Legislature overhauled the statutory scheme governing nonjudicial foreclosure in 2012 and enacted the HBOR, it understood it was legislating against a backdrop of preexisting remedies, one of which was postforeclosure monetary relief for violation of section 2924b.  The enhanced damages and attorney fees that the Legislature selectively made available for listed violations under the HBOR may not be recovered were Morris to prevail on this claim, but the full spectrum of tort damages is recoverable.  (§ 3333; see *Miles v. Deutsche Bank National Trust Co.*, *supra*, 236 Cal.App.4th at p. 409.)

**E.** *Fourth Cause of Action (Negligence) Against All Defendants*

The trial court sustained the demurrers to the fourth cause of action for negligence for several reasons. First, the judge determined the amended complaint was fatally vague—the pleading repeatedly referred to action or inaction by "Defendants" or "Plaintiff's lender and/or servicer" but did not specifically allege which defendant committed which acts. Second, the court found there were no allegations of negligence specific to either Rushmore or U.S. Bank and thus the demurrers of those two defendants were sustained. Third, the trial court appears to have concluded Morris failed to allege facts sufficient to show the existence of a duty of care on the part of Chase or Rushmore, although it made no explicit finding in that regard. And fourth, it found Morris failed to allege how defendants' negligent conduct had caused Morris's "default." We need only address the court's third ground for sustaining the demurrers as to the fourth cause of action, for that rationale is dispositive.

"To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries." (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62.) Until recently, California courts were divided on whether a residential mortgage lender owes a common law duty of care to a borrower under a negligence theory (compare *Lueras*, at p. 68 [no "common law duty of care to offer, consider, or approve a loan modification"] with *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 948, 951 [lender owed borrower a duty of care in processing loan modification application]). But in *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, our Supreme Court resolved the conflict, adopting the *Lueras* view and overruling the *Alvarez* line of cases. (*Id.*, at p. 948, fn. 12.) *Sheen* dictates affirmance of the

48

trial court's order sustaining defendants' demurrers to Morris's fourth cause of action for negligence as to all of the defendants.

**F.** ***Eighth Cause of Action (Voiding of Trustee's Sale) and Ninth Cause of Action (Quiet Title) Against All Defendants***

We conclude the trial court correctly sustained the demurrers to the eighth cause of action to set aside the trustee's sale and ninth cause of action to quiet title. As the trial court explained, a borrower seeking to set aside a trustee's sale "on the ground that the sale is voidable due to irregularities in the sale notice or procedure," as Morris does here, must first "offer to pay the full amount of the debt for which the property was security." An offer of tender must be "one of full performance [citation] and must be unconditional to be valid." (*Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 580.) Similarly, a "borrower may not . . . quiet title against a secured lender without first paying the outstanding debt on which the mortgage or deed of trust is based." (*Lueras v. BAC Home Loans Servicing, LP*, *supra*, 221 Cal.App.4th at p. 86.) "The rationale behind the rule is that if [the borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower]." (*FPCI RE-HAB 01 v. E & G Investments, Ltd.* (1989) 207 Cal.App.3d 1018, 1022.)

There is no allegation in the amended complaint that Morris paid the outstanding debt or actually tendered the full amount of the debt; in fact she admitted just the opposite. She only alleged that she was "willing and able to tender funds." Such an allegation was insufficient to satisfy the tender requirement. (See *Ram v. OneWest Bank, FSB*, *supra*, 234 Cal.App.4th at pp. 10–11; *Fonteno v. Wells Fargo Bank, N.A.* (2014) 228 Cal.App.4th 1358, 1372–1374 [calling plaintiffs' allegation that they were "ready, willing and

49

able" to make partial payments "flawed" and holding instead that full tender was equitably excused].)

Morris argues it would be inequitable to require strict compliance with the tender rule. True, there are exceptions to the rule, including when its enforcement would be inequitable (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 112–115), but the trial court found the amended complaint makes no allegation of facts that would support an exception. Nor does she make any meaningful argument on appeal to support her position that enforcement would be inequitable. To support the argument that enforcement would be inequitable, she refers as factual support to a document not in the record. (See *ante*, fn. 3.) " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793; see *Duncan v. Ramish* (1904) 142 Cal. 686, 689–690 [rejecting "skeleton" arguments].) Even more fundamentally, Morris fails to allege that U.S. Bank was not a bona fide purchaser for value or that it took title with knowledge of any claim to title from Morris or any other party. Thus, her allegations, even if in all other respects true, and even if she had some basis to overcome the tender rule and save her eighth and ninth causes of action against Chase and Rushmore, are still insufficient to overcome the conclusive presumption favoring the validity of the trustee's sale vis-à-vis U.S. Bank. (*Moeller*, *supra*, 25 Cal.App.4th at pp. 830–831.)

## G. *Eleventh Cause of Action (Bus. & Prof. Code, § 17200 et seq.) Against Chase and Rushmore*

The trial court concluded Morris could not state a viable UCL cause of action because the amended complaint was "bereft of allegations" showing Morris suffered economic injury and causation. Here, too, it was correct. To

50

have standing, an individual seeking to enforce the UCL is required to allege he or she "suffered injury in fact" and "lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204; see *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 334–337.)

The first amended complaint makes clear that Morris's UCL cause of action derives from her claims under sections 2923.6 and 2923.7 and her negligence claim. Business and Professions Code section 17200 " ' "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180; see *Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 178 [unfair competition cause of action stands or falls depending on fate of antecedent substantive cause of action].) In *Taniguchi v. Restoration Homes LLC* (2019) 43 Cal.App.5th 478, 490–491, Division Two of this district held a violation of section 2924c, which protects a borrower's right to reinstatement of the loan, supports a cause of action under the UCL.

Notably, however, restitution is the only form of monetary recovery allowed under the UCL. (Bus. & Prof. Code, § 17203; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1146–1148.) The kinds of consequential damages alleged in Morris's HBOR causes of action and in the UCL cause of action itself, which amount to a literal litany of lost opportunities, are not recoverable in a UCL cause of action. The UCL expressly authorizes an order "restor[ing] to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.) Thus, if she could pass the "by means of" test she could arguably seek return of her house as a form of restitution.

51

But Morris is not seeking and cannot amend her complaint to seek recovery of her house from Chase or Rushmore.  Morris admits U.S. Bank now has title to the house, and she has alleged no UCL violation against U.S. Bank.  We therefore affirm the trial court's order sustaining the demurrers and denying leave to amend on the eleventh cause of action and the judgments entered thereon because the remedy Morris seeks, to the extent it might qualify as restitution, is not available against the alleged anticompetitive wrongdoers.

## III. DISPOSITION

The judgment of dismissal is affirmed for U.S. Bank on all causes of action asserted against it.  The judgment is reversed as to Chase and Rushmore on the first, second, and third causes of action and the trial court is directed to enter a new and different order overruling the demurrers with respect to those claims.  The judgments on the remaining causes of action are affirmed.  The cause is remanded for further proceedings consistent with this opinion.  Morris shall recover her costs on appeal from Chase and Rushmore.  U.S. Bank shall recover its costs on appeal from Morris.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

52

Trial Court:  Superior Court of California, County of Contra Costa

Trial Judge:  Hon. Steven K. Austin

Counsel:      Bulgucheva Law, Lilia Bulgucheva, for Plaintiff and Appellant.

Dykema Gossett, Ashley R. Fickel and Cory L. Webster, for Defendant and Respondent JP Morgan Chase Bank, N.A.

Kirby & McGuinn, Jana Logan and Matthew H. Aguirre, for Defendants and Respondents Rushmore Loan Management Services LLC; U.S. Bank, N.A. as Legal Title Trustee for Truman 2016 SC6 Legal Title Trust.